IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BRUCE M. BEATTY, | ) | No. 31409-0-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| WASHINGTON FISH and WILDLIFE | ) | |
| COMMISSION, WASHINGTON | ) | |
| DEPARTMENT OF FISH AND | ) | |
| WILDLIFE, AND POLLUTION | ) | |
| CONTROL HEARINGS BOARD, | ) | |
| | ) | |
| Respondents. | ) | |

KNODELL, J.* — Bruce Beatty applied for a hydraulic mining permit to operate a suction dredge on Fortune Creek outside of the work window dates established by the Washington Department of Fish and Wildlife (WDFW) Fish and Gold Pamphlet. The WDFW granted the permit, but included a condition that limited suction dredging to the dates within the work window. The WDFW informed Mr. Beatty that his request to operate a suction dredge outside the work window could still be granted if he provided

---

* Judge John D. Knodell is serving as judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

site specific information that allowed the WDFW to assess the impact to fish life. Mr. Beatty refused and appealed the permit decision to the Pollution Control Hearings Board (PCHB). The PCHB upheld the terms of the permit, concluding that WDFW's decision was reasonably designed to protect fish life and not out of proportion to the proposed dredging activity given the lack of information provided by Mr. Beatty. The superior court upheld the PCHB's decision. Mr. Beatty appeals. We find no error with the PCHB's decision to uphold the permit. We affirm the decision of the superior court.

## FACTS

The WDFW regulates placer mining statewide.[1] In 2009, the WDFW instituted the current placer mining regulations in the Gold and Fish Pamphlet (Pamphlet). According to the Pamphlet, placer miners are allowed to use certain small handheld tools without restriction. However, miners using motorized equipment, such as suction dredges, are restricted to specific dates established for individual streams throughout the state. Miners wishing to prospect outside the allowed mining methods or dates established in the Pamphlet can apply to the WDFW for an individual hydraulic project approval (HPA) permit.

---

[1] Placer mining involves searching for gold that has moved away from its original host rock, migrated downstream, and settled into the streambed sediment.

The specific dates, known as work windows, are developed to protect fish spawning activity and egg development through the emergence of juvenile fish called fry. The timing of the work window for each stream is based on the spawning habits of fish species residing in the stream. An important spawning habit is the creation of nests, called redds. A redd is formed when a spawning female fish excavates a hole in small, loose gravel on the stream bed and deposits eggs. After a male fish fertilizes the eggs, the female pushes gravel over the eggs. The eggs develop in the gravel.

Suction dredging mining disturbs gravel in a stream bed, although miners tend to target packed gravel as opposed to the loose gravel used by fish. A suction dredge uses a gas engine and suction hose to remove material from the stream bed. The material is then deposited in a sluice box on a floating platform where the riffle box captures heavier gold. The remaining material is discarded from the unit and returned to the stream. While operating the suction dredge, the miner is in the water lying prone on or near the stream bed with a diving mask, directing the hose to the desired material. Miners pay close attention to the material entering the hose to prevent items from clogging the flow and slowing the process.

Typically, the best gold is found near or on bedrock. Miners using a suction dredge commonly test the productivity of an area by creating a sample hole down to the

bedrock. If there are no viable signs of gold, the miner will move to another location. However, because the dredge equipment is heavy, miners pick a spot that gives them the most opportunities for alternatives.

Generally, areas ideal for suction mining are not ideal for fish redds. Suction dredge miners generally do not consider loose streambed material favorable for gold deposits. However, both placer miners and redd building fish like stream material that collects on the back side of large boulders and rocks.

Mr. Beatty sought an HPA permit to operate a suction dredge on Fortune Creek outside the work window. Fortune Creek is a high elevation, high velocity tributary to the Cle Elum River. While the main stem of the creek is approximately 2.5 miles, the creek also has a north fork, a south fork, and a number of smaller tributaries. The creek passes through federally owned forest land and is open to recreational fishing.

Different portions of the Fortune Creek system exhibit distinct habitat characteristics for fish. Some areas have boulders with limited spawning areas, and other areas have more gravel and less velocity, creating a better spawning environment. Several species are known to reside in the creek, including spring cutthroat trout, rainbow trout, fall brook trout, and whitefish. Additionally, bull trout redds and limited numbers of bull trout have been observed in Fortune Creek.

For Fortune Creek, the work window for suction dredging is August 1 through August 15. WDFW based the start date on rainbow trout and steel head spawning in similar streams in the vicinity of Fortune Creek. The ending date is based on the observation of bull trout redds in the creek. Although discovery of the redds occurred in September, WDFW concluded that the redds were likely constructed in August.

In Mr. Beatty's HPA permit, he sought to use suction dredging and powered highbanking tools on Fortune Creek anywhere within the Fortune Creek watershed at any time within the five year period between May 1, 2011, and September 30, 2016, with suction dredging occurring between the months of May and September.

Mr. Beatty intended to dredge 60 linear feet of stream bed each year. He planned to use either a three- to four-inch suction intake nozzle, or if allowed, a six-inch suction intake nozzle. Like other miners, Mr. Beatty planned to put down sample holes until he reached a satisfactory site. If he found a deposit, he possibly would use a highbanker in conjunction with the suction dredge.[2]

The WDFW issued Mr. Beatty a two year HPA permit and granted his request to use a gasoline-powered highbanker outside of the work window in the Pamphlet. However, the WDFW limited suction dredging to the two-week work window. In a letter

---

[2] A highbanker processes material at a mining location away from the stream.

to Mr. Beatty, the WDFW explained that it granted the permit for the highbanker but wished to conduct a site visit to evaluate the impact that the prospecting activities had on fish life in the relatively small stream. It also stated that it could not approve the suction dredging request because Fortune Creek had both spring and fall spawning fish, and eggs from these fish could be found in the gravel before and after the approved work window. Nevertheless, the WDFW said that permit approval for suction dredging was still a possibility for Mr. Beatty in Fortune Creek. The letter continued, "'[I]f you were to provide us with site specific information where we can conduct a site assessment regarding the impacts to fish life, we may be able to issue a permit to allow work with a suction dredge outside of the standard work window.'" Clerk's Papers (CP) at 57.

Mr. Beatty chose not to provide site specific information to WDFW after receipt of the letter. He did not believe that identifying particular dredging locations on the stream would be meaningful because conditions change each year. He also declined WDFW's offer to make a site visit and discuss measures that could be added to the permit to protect the fish species spawning in Fortune Creek.

Mr. Beatty appealed the decision to the PCHB. An administrative hearing was held on the matter. Mr. Beatty contended that the condition restricting suction dredging

to the work window was unreasonable because it did not serve the purpose of protecting fish life as required by RCW 77.55.021.

Mr. Beatty presented evidence in an attempt to establish that the restriction was not needed because there was a low likelihood that his operation would harm fish life in Fortune Creek. Dr. Robert Crittenden, a biometrician and fish biologist, testified that the chance of a suction dredge miner encountering a redd on Fortune Creek was miniscule. Dr. Crittenden did not prepare a formal or detailed statistical analysis of potential harm to redds or the likelihood of encountering redds during spawning season. However, he presented a "back of the envelope" calculation of the statistical likelihood of a suction dredge miner encountering a redd on Fortune Creek. CP at 290. Dr. Crittenden's calculation used the size of the entire watershed area, anywhere between 5 and 10 miles, with Mr. Beatty mining 60 feet of stream anywhere in the watershed. By estimating the number of redds and assuming the redds were randomly located, Dr. Crittenden estimated that the probability of encountering a redd was anywhere between one in ten thousand and one in a million. Dr. Crittenden stated that the probability was zero if miners and fish preferred different areas of the creek. Even then, Dr. Crittenden reasoned that harm to fish eggs was of little importance to protecting fish life because the majority of the eggs die under natural causes.

7

Dr. Crittenden admitted that his personal observation of the creek was very limited. He stated that he observed the top ford of the creek once, but never visited the main stem of the creek. His conclusion that only a small portion of the creek was suitable redd habitat was based on the reports of others.

Mr. Beatty testified that he would not encounter any redds because he avoids the type of areas that they are located. He said that he had never seen or stumbled across a redd. When asked what a redd looks like, Mr. Beatty gave a description of typical color, size, and location, but could not answer more specific questions. Mr. Beatty said that he works underwater close to the suction nozzle, so if he encounters a redd, he could move the nozzle away and take his equipment elsewhere.

Mr. Beatty testified that he felt he was discriminated against in connection with the permit because other miners were getting increased work windows for suction dredging in other waterways in Washington. Mr. Beatty said that he was involved with the Pamphlet rule making process, and that the process was not smooth and harmonious. He stated that in one meeting, Perry Harvester repeatedly interrupted Mr. Beatty's wife while she tried to make a comment. Mr. Harvester's boss apologized for the incident.

WDFW maintained that the decision on Mr. Beatty's permit was based on the information that he provided. WDFW biologists William Meyer and Mr. Harvester

testified that WDFW refused to extend the work window for suction dredging because of the lack of information about where Mr. Beatty would prospect. Mr. Meyer said that he could not determine the risk to the Fortune Creek area because Mr. Beatty failed to give him the information he needed to calculate quantitative impact.

Mr. Harvester testified that the purpose of the restriction on Mr. Beatty's permit was the protection of fish life. Similarly, Mr. Meyer stated that his job was to write a permit that protects fish life, including eggs, fry and adults. He felt that he accomplished this purpose with Mr. Beatty's permit. He limited Mr. Beatty to the standard work window for suction dredging because Mr. Beatty would not discuss other options for the permit. However, he believed that there were areas where Mr. Beatty would have been approved to mine.

As for fish life in Fortune Creek, Mr. Meyer testified that the creek is a good fish habitat and holds a number of different species of fish. Mr. Meyer personally observed the fish in the river during night snorkels. While he never witnessed a bull trout, he read reports that they were in the creek. The WDFW presented fish surveys of Fortune Creek that noted the presence of bull trout and other fish.

Mr. Meyer testified that there were several areas on Fortune Creek that were suitable for redds, depending on the size of the fish. These areas include pools on the

back side of large boulders suitable for placer mining. Mr. Meyer explained that the fish in Fortune Creek spawn primarily in concentrated areas, which if hit, would suffer a catastrophic impact.

Also, Mr. Meyer testified that a trained biologist would have difficulty spotting redds before they are dug into. He described the redds found in high elevation streams as very tiny eggs, approximately the size of BBs. Mr. Harvester used pictures of redds in streams to demonstrate the difficulty in spotting them.

The WDFW presented evidence of the impact of running eggs through a suction dredge. Eggs in their first stage of development that are caught in suction have a mortality rate of nearly 100 percent. The mortality rate decreases significantly for eggs in their second stage. However, when eggs develop into sac fry, the mortality rate jumps up again to approximately 83 percent. In addition, eggs that survive the suction dredge are deposited on the streambed without cover, placing the eggs in extreme danger from predators and in an environment unsuitable for development.

In contrast to Dr. Crittenden's testimony, Mr. Harvester testified that protecting redds is very important in developing fish populations. Furthermore, protecting redds of later emerging fish is important for genetic reasons. Redds from early-producing fish

could be wiped out by a single flood event. However, redds produced after the flood event would still have a chance to survive.

Mr. Harvester did not agree that he had a personal conflict with Mr. Beatty, and that his statements to Mr. Beatty's wife during the meeting were nothing more than a request for her to sit down if she did not have a question regarding the rules. Mr. Harvester said he played a limited role in processing Mr. Beatty's permit.

The PCHB limited review of Mr. Beatty's arguments to those that addressed the WDFW's actions in the permit approval process. The PCHB found the permit review proceeding was not the appropriate vehicle for challenging the administrative rules the WDFW adopted and incorporated into the Pamphlet. For instance, the PCHB determined that Mr. Beatty's argument that fish protection should only be conducted on the resource level, rather than safeguarding all eggs and fish, is an attack on the regulations governing the work window and not a justification for an individual extension of the rules based on site specific information.

The PCHB affirmed the WDFW's permit decision, concluding that the conditions placed on Mr. Beatty's permit were reasonably designed to protect fish life and do not impose restrictions unrelated or out of proportion to the proposed dredging activity.

Citing RCW 77.55.021, the PCHB explained that in order for an applicant to obtain an individual HPA permit extending the duly adopted timing window, the applicant must provide information showing that the requested activity would not harm fish life or habitat based on the conditions specific to the operation or conditions specific to the stream involved. The PCHB concluded that Mr. Beatty, as the applicant, failed to provide the information necessary to fully evaluate the impact of extending a duly adopted work window. He did not identify practices he would employ to avoid redds or describe any conditions on segments of Fortune Creek that might reduce the prospect of harm to redds. He refused to provide any information to the WDFW about his prospecting plans beyond his desire to suction dredge anywhere in the Fortune Creek watershed between May 1 and September 30 each year. Nor did he make an effort to gather information that would justify special exceptions from the established regulations for his prospecting in Fortune Creek. The PCHB explained that Mr. Beatty cannot expect to obtain approval of an HPA to relax a previously adopted regulation for protecting fish without providing any grounds or substantiation for the deviation from the regulation.

The PCHB discredited Dr. Crittenden's testimony. It found Dr. Crittenden's statistical approximations were not based on valid assumptions for Fortune Creek. The approximations did not consider site specific operations or stream conditions when

estimating the harm to fish. The same type of statistics applied to any stream with spawning activity. Furthermore, a statistical calculation based on the entire area within the watershed was again just a further attack on the WDFW policy of establishing a work window to protect fish and eggs.

The PCHB also discredited Mr. Beatty's testimony that he could avoid harm by stopping the dredge immediately if he observed a redd. The PCHB found that it was unlikely that Mr. Beatty could see a redd before sucking it up into a dredge. The PCHB relied on evidence that redds are difficult to identify in a high velocity small stream like Fortune Creek and on evidence of Mr. Beatty's inexperience and lack of training in identifying eggs. The PCHB also found that stopping the dredge after encountering a redd would not avoid harm to eggs already sucked into the dredge and would decrease the number of fish emerging. The PCHB recounted evidence that many of the eggs that are sucked into a dredge are killed directly and the ejected eggs are deposited into a setting that does not allow for further development of fish.

The PCHB also recognized that the Pamphlet already requires miners to stop dredging if they encounter a redd. The PCHB reasoned that if stopping dredging activity when eggs are encountered is adequate protection, then the Pamphlet would not have identified specific work windows at all. The court concluded that Mr. Beatty's argument

13

was another improper attack on WDFW regulations rather than a justification for relaxed restrictions based upon the specific conditions on Fortune Creek.

In affirming the permit condition, the PCHB concluded that Mr. Beatty failed to show that the condition on his permit was not reasonably designed to protect fish life, citing RCW 77.55.021. The dredging dates Mr. Beatty requested in the permit were the period of time that WDFW had determined through the Pamphlet rulemaking process that fish redds would be present in Fortune Creek. The PCHB concluded that without any other information from Mr. Beatty on specific plans, the WDFW was not unreasonable in refusing to allow unrestricted suction dredging in Fortune Creek during the time periods that encompassed spawning and egg development.

The PCHB also concluded that Mr. Beatty failed to show that the condition placed on the permit to optimize fish life was out of proportion to the impact of the proposed project, citing RCW 77.55.231(1). The court found that limiting work to the work window was a method of avoiding direct harm to fish, rather than a directive to enhance or improve existing fish habitat. Also, the condition was specially designed to address the harm to redds and eggs posed by the suction dredging activity in question and did not extend to enhancing habitat features or repairing damage caused by other persons or prior activity. Because Mr. Beatty did not include information in his application to support a

14

deviation from the work window, the WDFW acted reasonably in limiting suction dredging to the time frame set forth in the Pamphlet.

Finally, the PCHB concluded that the WDFW's decision on the permit was not the result of personal animosity toward Mr. Beatty. The PCHB determined that Mr. Beatty did not demonstrate that he received unfair treatment when compared to other miners. Other miners obtained extensions based on information specific to their proposed site. The WDFW provided Mr. Beatty the same opportunity to provide additional site specific information and offered to work with him to develop limits that would protect fish. The PCHB found that the WDFW was willing to vary the work window timing standards based on specific facts. Instead, Mr. Beatty chose to stand on his asserted right to mine without limitation.

Mr. Beatty appealed the PCHB's decision to the Kittitas County Superior Court.[3] The court affirmed the PCHB's final order. The court found that substantial evidence supported the factual findings, that the statutory scheme of Washington's regulations on small scale mineral prospecting and mining is neither unconstitutionally vague nor preempted by federal law, and that the final order did not erroneously apply or interpret

---

[3] Mr. Beatty amended his petition for review to add a challenge to the Pamphlet rules. Later, the parties stipulated to bifurcate the rule challenge. The rule challenge is not a part of the appeal before this court.

the law. The court's decision focused on Mr. Beatty's refusal to provide site specific information despite WDFW's request. The court noted that the most critical fact in the proceedings was Mr. Beatty's refusal to meet and discuss his specific site information.

Mr. Beatty appeals the decision of the PCHB. He contends that (1) the PCHB misinterpreted the state hydraulic mining code when imposing the conditions, (2) the PCHB's order is not supported by substantial evidence, (3) the conditions on the permit conflict with federal mining law, (4) the hydraulic mining code is unconstitutionally vague, (5) WDFW discriminated against him when it imposed the condition, and (6) the WDFW relied on an invalidly adopted rule to impose the condition.

## ANALYSIS

The Washington Administrative Procedure Act, chapter 34.05 RCW, provides for judicial review of PCHB's orders. RCW 34.05.570; *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 587, 90 P.3d 659 (2004). When reviewing an agency's action, this court sits in the same position as the superior court. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). The party challenging the agency action has the burden of demonstrating the invalidity of the action. RCW 34.05.570(1)(a). The challenging party must show that he or she has been substantially prejudiced by the agency action. RCW 34.05.570(1)(d). Additionally, reviewing courts

16

shall grant relief only if the challenging party shows that the agency's order is invalid for one or more of the grounds enumerated in RCW 34.05.570(3)(a)-(i). We address Mr. Beatty's challenges under RCW 34.05.570(3) individually.

*Interpretation of the Hydraulic Code.* Mr. Beatty contends that the WDFW misinterpreted and misapplied the hydraulic permitting statute. Relief may be granted if this court finds that the PCHB has "erroneously interpreted or applied the law." RCW 34.05.570(3)(d). Whether the PCHB has erroneously interpreted or applied the law is reviewed under the error of law standard. *Cascade Court Ltd. P'ship v. Noble*, 105 Wn. App. 563, 566-67, 20 P.3d 997 (2001). When applying the error of law standard, the court may substitute its own judgment for that of the PCHB, although it must give substantial weight to the agency's view of the law it administers. *Id.* at 567. Regulations that are consistent with the legislative scheme will be upheld. *William Dickson Co. v. Puget Sound Air Pollution Control Agency*, 81 Wn. App. 403, 407, 914 P.2d 750 (1996) (quoting *ASARCO, Inc. v. Puget Sound Air Pollution Control Agency*, 112 Wn.2d 314, 321, 771 P.2d 335 (1989)).

Relief can also be granted if the reviewing court finds the agency order is arbitrary and capricious. RCW 34.05.570(3)(i). An agency order is arbitrary or capricious if it is willful and unreasoning and disregards or does not consider the facts and circumstances

17

underlying the decision. *Alpha Kappa Lambda Fraternity v. Wash. State Univ.*, 152 Wn. App. 401, 421, 216 P.3d 451 (2009) (quoting *Bowers v. Pollution Control Hearings Bd.*, 103 Wn. App. 587, 596, 13 P.3d 1076 (2000)). A decision is not arbitrary or capricious if there is room for more than one opinion and the decision is based on honest and due consideration, even if we disagree with it. *Id.* at 421-22 (quoting *Bowers*, 103 Wn. App. at 596).

In 1997, the Washington legislature declared that small scale mineral prospecting and mining

> (1) [i]s an important part of the heritage of the state; (2) provides economic benefits to the state; and (3) can be conducted in a matter that is beneficial to fish habitat and fish propagation. Now, therefore, the legislature declares that small scale prospecting and mining shall be regulated in the least burdensome manner that is consistent with the state's fish management objectives and the federal endangered species act.

LAWS OF 1997, ch. 415, §1.

The legislature tasked the WDFW to adopt rules applicable to small scale prospecting and mining in cooperation with the recreational mining community and other interested parties. RCW 77.55.091(2). The WDFW included these regulations on mineral prospecting as part of the hydraulic code rules, WAC 220-110. *See* WAC 220-110-200 to -206. The hydraulic code provides protection for fish life through the development of a statewide system of rules for hydraulic projects or other work that

18

will use, divert, obstruct, or change the natural flow or bed of state waters. WAC 220-110-010. Implementation of the hydraulic code rules is necessary to minimize project specific and cumulative impacts to fish life. WAC 220-110-010.

For small scale mining, the legislature required WDFW to distribute a pamphlet describing the methods of mineral prospecting consistent with WDFW's adopted rules. RCW 77.55.091(3). "The pamphlet shall be written to clearly indicate the prospecting methods that require a permit under this chapter and prospecting methods that require compliance with the pamphlet." RCW 77.55.091(3). The Pamphlet contains regulations that a person must follow when mineral prospecting and placer mining. WAC 220-110-200(1).

A person may request an exception to the Pamphlet by applying for an individual HPA permit. WAC 220-110-200(2). To obtain an individual permit, a person must submit a written application containing general plans for the overall project, complete plans and specifications for the proposed construction or work within the ordinary high water line in freshwater, and complete plans and specifications for the proper protection of fish life, among other requirements. WAC 220-110-030; *see also* RCW 77.55.021(2)(a)-(c).

The only ground upon which approval of a permit may be denied or conditioned is the protection of fish life. Former RCW 77.55.021(3)(a) (2010). If the WDFW denies approval of a permit, it shall provide the applicant with a written statement of the specific reasons why and how the proposed project would adversely affect fish life. Former RCW 77.55.021(4). "An HPA shall be denied when, in the judgment of the [WDFW], the project will result in direct or indirect harm to fish life, unless adequate mitigation can be assured by conditioning the HPA or modifying the proposal." WAC 220-110-030(14).

Approval of a permit may not be unreasonably withheld or unreasonably conditioned. Former RCW 77.55.021(3)(a). "Conditions imposed upon a permit must be reasonably related to the project. The permit conditions must ensure that the project provides proper protection for fish life, but the department may not impose conditions that attempt to optimize conditions for fish life that are out of proportion to the impact of the proposed project." RCW 77.55.231(1).

The WDFW mitigation policy provides, "WDFW shall determine the project impact, significance of impact, amount of mitigation required, and amount of mitigation achieved, based on the best available information, including the applicant's plans and specifications. For large projects with potentially significant impacts, this will be based

20

on review of studies approved by WDFW." Ex. A-36 at 4. A similar but lengthier definition of "mitigation" can be found in WAC 220-110-020(66).

Mr. Beatty makes several challenges to the WDFW's interpretation of the statutory scheme governing his hydraulic mining permit. First, Mr. Beatty contends that the PCHB misinterpreted the legislative mandate to protect fish life as reflected in RCW 77.55.021. He contends that the WDFW interpreted the mandate to mean that every fish egg must be protected when issuing a permit under the hydraulic code, and used this interpretation as a basis to deny his request to suction dredge outside the work window.

Contrary to Mr. Beatty's assertion, protection of every egg is not the interpretation adopted by the WDFW or the PCHB. The WDFW biologists who testified did not advocate for every egg, but recognized that protection of eggs must be based on the impact the eggs have on the fish population. As stated by Mr. Harvester, "But the idea was to protect most of the fish most of the time over most of the conditions that we have observed. So the intent was not to protect every fish. We knew that." CP at 179.

WDFW's policy to protect fish life in general is reflected in the creation of work windows for mining. Work windows protect fish life by identifying the fish residing in each of hundreds of watercourses throughout the state and calculating the incubation periods necessary to protect the redds and eggs developing through emergence. The

21

establishment of a work window contemplates some harm to fish eggs and fish life that develop outside of the specified dates. The work window provides a baseline measure of protection without any need for further regulatory control and does not contemplate protection of every egg. Thus, limiting Mr. Beatty to the work window did not evidence an interpretation by WDFW or PCHB that every egg must be protected.

Second, Mr. Beatty contends the PCHB wrongly applied RCW 77.55.231, which requires the WDFW to develop permit conditions in proportion to the impact of the proposed project. Mr. Beatty argues that the WDFW was required to determine the specific impact of his project before imposing conditions. Instead of following the statute and policy, Mr. Beatty contends that PCHB allowed the WDFW to forego presenting testimony on the proposed impact and instead concluded that Mr. Beatty was responsible for providing the information.

The PCHB did not err in its interpretation or application of RCW 77.55.231 when deciding that WDFW's permit decision was correct. RCW 77.55.231 states that the WDFW is responsible for assuring that permit conditions that attempt to optimize conditions for fish life are not out of proportion to the impact of the proposed project. The WFDW presented testimony at the hearing justifying the imposition of the condition. The WDFW judged the impact of Mr. Beatty's project by considering the specifications

for the proposed construction and the proper protection of fish life. *See* RCW 77.55.021(2). Mr. Beatty's request was to suction dredge outside of the work window in Fortune Creek with no time or place restrictions. The WDFW determined that dredging outside of the work window was harmful for fish life when it developed the Pamphlet. Thus, without information in Mr. Beatty's application explaining why he would qualify for an exception to the work window, imposing a permit condition in accordance with the Pamphlet is not out of proportion to the impact of the project.

Furthermore, neither RCW 77.55.231, nor the permit application process in RCW 77.55.021, nor the hydraulic mining code in WAC 220-110 require the WDFW to quantify the precise likelihood of impacts to fish life before imposing conditions. Instead, Mr. Harvester testified that risk outside the work window is based on a biologist's observations in conjunction with specific site and operation information provided to the WDFW. Again, Mr. Beatty provided no specific site information to the WDFW, so there was no basis to impose conditions other than those adopted in the Pamphlet. There is no misinterpretation of RCW 77.55.231.

Next, in a related issue, Mr. Beatty contends that the PCHB and WDFW failed to obey the command of the legislature to utilize the least burdensome form of regulation.

23

Mr. Beatty maintains that the WDFW needed to insert provisions in his permit to minimize impacts rather than denying his request to work outside of the work window.

While legislative policy advocates for the least burdensome regulations, there is no statutory requirement that the WDFW must insert provisions in his permit that minimize impact. Also, there is no reason to conclude that other provisions were available to Mr. Beatty based on the information provided in his permit. Suction dredging in Fortune Creek is harmful to fish life when it occurs outside of the work window. To minimize impact, WDFW prohibited suction dredging during this period. If other less burdensome regulations were available to minimize impacts, they would have been included in the Pamphlet. Therefore, the PCHB did not misinterpret the permitting scheme by failing to require the WDFW to add minimizing impact provisions to Mr. Beatty's permit.

Last, Mr. Beatty contends that the PCHB interpreted an extra obligation into the statutory permit process that requires an applicant to meet with the WDFW and provide more information before a decision can be granted.

The PCHB did not add an extra requirement to the permitting process. Mr. Beatty was required to include site specific information in his permit application according to WAC 220-110-030. The PCHB acknowledged the reason for the denial of Mr. Beatty's permit was his lack of information to substantiate a deviation from the adopted work

window regulations. The WDFW offered to meet with Mr. Beatty to help gather the information needed to assess the application, but did not require the visit. The PCHB's determination that Mr. Beatty needed to provide more information to qualify for an exception to the Pamphlet was not a misinterpretation of the law. The PCHB correctly interpreted the hydraulic code when it affirmed the conditions on Mr. Beatty's permit.

*Sufficiency of the Evidence.* Mr. Beatty contends that the PCHB's decision to uphold the permit conditions is not supported by the evidence.

The substantial evidence standard in RCW 34.05.570(3)(e) allows this court to grant relief if the agency's decision "is not supported by evidence that is substantial when viewed in light of the whole record before the court." Evidence is substantial if it is in sufficient quantum to persuade a fair-minded person of the truth of the declared premise. *Heinmiller v. Dep't of Health*, 127 Wn.2d 595, 607, 903 P.2d 433 (1995) (quoting *Thieu Lenh Nghiem v. State*, 73 Wn. App. 405, 412, 869 P.2d 1086 (1994)). This standard is highly deferential to the agency fact finder. *ARCO Prods. Co. v. Utils. & Transp. Comm'n*, 125 Wn.2d 805, 812, 888 P.2d 728 (1995). When reviewing the evidence, the court should give substantial deference to the agency's determinations, which are based heavily on factual matters, especially when the factual matters are complex, technical, and close to the heart of the agency's expertise. *Hillis v. Dep't of Ecology*, 131 Wn.2d 373,

25

396, 932 P.2d 139 (1997). Reviewing courts do not substitute their judgment for that of the decision maker with regard to the credibility of witnesses or the weight granted to conflicting evidence. *William Dickson Co.*, 81 Wn. App. at 411 (quoting *State ex rel. Lige & William B. Dickson Co. v. County of Pierce*, 65 Wn. App. 614, 618, 829 P.2d 217 (1992)).

The agency's legal conclusions receive de novo review under the error of law standard. *Stuewe v. Dep't of Revenue*, 98 Wn. App. 947, 949, 991 P.2d 634 (2000).

Mr. Beatty asserts that the WDFW failed to present substantial evidence showing impact or risk to fish. And, without any evidence of impact, the PCHB could not uphold the denial of his permit request. Implicit in this argument is the notion the WDFW bears the burden, when denying a permit, of demonstrating some likelihood his proposed mining operation will endanger fish life.

As a preliminary note, it is not appropriate under Washington law to shift the burden of proof under these circumstances to the WDFW as Mr. Beatty suggests. WAC 371-08-485 placed the burden on Mr. Beatty in the administrative hearing and RCW 34.05.570(1)(a) places the burden on Mr. Beatty in this appeal. Furthermore, "[w]hen information necessary to proof 'is exclusively within the knowledge of one or the other of the parties, the burden would be upon the party possessed of that knowledge to

26

make the proof.'" *Cedar River Water & Sewer Dist. v. King County*, 178 Wn.2d 763, 779, 315 P.3d 1065 (2013) (quoting *Jolliffe v. N. Pac. R.R.*, 52 Wash. 433, 436, 100 P. 977 (1909)). Only Mr. Beatty knows the locations of Fortune Creek where he proposes to suction dredge. The burden of proof cannot shift to WDFW. WDFW does not have access to site specific location information of Mr. Beatty's suction dredging as he did not supply it with his initial application or after WDFW requested it.

In his sufficiency of the evidence argument, Mr. Beatty assigns error to several of the PCHB's findings. First, he challenges the findings that bull trout redds and bull trout have been observed in Fortune Creek. This finding is supported by substantial evidence. The WDFW presented records from night snorkeling surveys conducted in July 2000 that documented bull trout in Fortune Creek. Also, the WDFW submitted a draft of a 2000 study by the United States Fish and Wildlife Service that found at least 11 bull trout redds in Fortune Creek. The PCHB relied on these studies in its findings. These studies support the PCHB's finding of bull trout in Fortune Creek.

Second, Mr. Beatty challenges the findings that pertain to his ability to mitigate the damage to fish eggs. He assigns error to the findings that he had no real experience in recognizing redds and that redds were generally difficult to locate. Also, Mr. Beatty

27

contends that the PCHB should have allowed hearsay declarations from other miners who stated that they never found fish eggs.

These findings are also supported by substantial evidence. Mr. Beatty testified that he had never seen a redd. While he gave a description of a redd, the testimony was based on information Mr. Harvester provided at a stakeholder meeting. Mr. Beatty could not answer when asked specific questions about the color of the eggs and the type of gravel where redds may be found. Mr. Harvester, a WDFW biologist, testified to the difficulties in identifying redds. This testimony of Mr. Beatty and Mr. Harvester sufficiently supports the PCHB's findings. Also, the PCHB did not err by excluding the declarations of the miners. The weight of this evidence would not have had an effect on the PCHB's findings.

Next, Mr. Beatty challenges the PCHB's finding that the WDFW's decision on the application was not the result of personal animosity toward Mr. Beatty. Mr. Beatty contends that the evidence of an altercation between his wife and Mr. Harvester created a bias against Mr. Beatty and led to the denial of his permit.

Substantial evidence supports the finding that the decision on the permit was not based on personal animosity or retaliation. While there is evidence of a brief exchange between Mr. Harvester and Mr. Beatty's wife at a rule development meeting, there is no

evidence that this influenced the permit decision. Mr. Harvester testified that he did not take umbrage against Mr. Beatty. The PCHB found this testimony credible.

Ultimately, Mr. Beatty contends that the evidence as a whole does not show an impact or risk to fish. Mr. Beatty's challenge is based largely on Dr. Crittenden's testimony that there is only a small chance—between one in ten thousand and one in a million—of randomly selecting a spot along the course of the affected river where fish were spawning. Mr. Beatty asserts that on the strength of this testimony there is only an insignificant chance he would mine at the site of a fish habitat. Thus, the WDFW did not demonstrate that his proposed mining operation would likely endanger fish life.

However, the WDFW was not required to find Mr. Beatty's mining operation was likely to harm fish life in order to deny him his permit. It was required to determine, based on the evidence provided, only whether the potential risk of his proposed operation could be adequately managed. The unavailability of sufficient evidence here resulted from Mr. Beatty's failure to submit a complete written application specifying each location of his proposed operation as he was required to do. Mr. Beatty was not going to select mining sites at random, as Dr. Crittenden's testimony suggested. In order to determine the probability that Mr. Beatty would mine at the site of a fish habitat, the WDFW had to know where those sites would be.

The PCHB correctly found that Dr. Crittenden's testimony was too general and not meaningful. Dr. Crittenden's testimony was really nothing more than a demonstration of the futility of making any kind of quantification of the risk of harm posed by Mr. Beatty's proposed operation. In evaluating the kind of evidence presented by Dr. Crittenden, one must ask whether (1) the study was properly designed and (2) whether it was based on sufficient data. The study, a "back of the envelope" calculation on its face did not answer a relevant question. It addressed only the likelihood of randomly selecting a spot on the river where fish were spawning. The relevant question was whether a mining site designated by the applicant (not randomly selected) would coincide with a fish habitat site. Additionally, Dr. Crittenden failed to employ any generally accepted hypothesis testing required to evaluate the significance of his conclusions. *See* D.H. Kaye, *Is Proof of Statistical Significance Relevant?*, 61 WASH. L. REV. 1333 (1986).

Apparently the only datum available to Dr. Crittenden was the length of the river. Dr. Crittenden was unable to supply any reliable data establishing even the proportion of the river covered by fish habitat. This, coupled with Mr. Beatty's failure to disclose the location of his operations made it impossible to make any meaningful prediction about the likelihood of harm occurring. There was no basis to estimate the degree of possible harm. This lack of data disfavored any kind of statistical proof. Under these circumstances, the

PCHB was entitled both to reject Dr. Crittenden's attempt to quantify the risk of Mr. Beatty's proposed operation and to conclude there was no adequate means of managing that risk. Thus, the PCHB's finding that Dr. Crittenden's testimony was too general and not meaningful is supported by evidence.

Mr. Beatty's challenge to the sufficiency of the evidence fails. Mr. Beatty's application did not include site or operation specific information that would have allowed the WDFW to determine the risks of Mr. Beatty's operation and whether an exception was warranted from the work window. The PCHB correctly concluded that "the conditions WDFW placed on [Mr. Beatty's permit] are reasonably designed to protect fish life and do not impose restrictions unrelated to or out of proportion to the proposed dredging activity." CP at 73-74. The PCHB order affirming the suction dredging condition is supported by substantial evidence.

*Conflict with Federal Mining Laws.* Mr. Beatty contends that WDFW's regulations are preempted by federal law because they materially interfere with mining on his federal mining claim. Mr. Beatty maintains that the condition on his permit essentially prohibits him from exercising his mining rights.

We may declare an agency rule invalid as applied if it violates constitutional provisions or if it exceeds statutory authority of the agency. RCW 34.05.570(3)(a), (b);

31

*Ass'n of Wash. Bus. v. Dep't of Revenue*, 155 Wn.2d 430, 437, 120 P.3d 46 (2005). The validity of an agency rule is reviewed de novo. *Ass'n of Wash. Bus.*, 155 Wn.2d at 437. Similarly, de novo review applies to questions of federal preemption. *Robertson v. Wash. State Liquor Control Bd.*, 102 Wn. App. 848, 853, 10 P.3d 1079 (2000).

The Supremacy Clause in the United States Constitution gives the federal government the power to preempt state law. *Arizona v. United States*, __ U.S. __, 132 S. Ct. 2492, 2500-01, 183 L. Ed. 2d 351 (2012). Preemption can occur in three ways: express preemption, field preemption, and conflict preemption. *Id.* Express preemption occurs when Congress expressly withdraws specified powers from a state through a statutory provision. *Id.* Field preemption occurs when Congress determines that a field of conduct must be regulated by its exclusive governance. *Id.* Conflict preemption occurs when federal and state laws conflict making compliance with both a physical impossibility, or when the challenged state law stands "'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 2495 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941)). Conflict preemption is at issue here, specifically, whether the permit conditions imposed by the WDFW and upheld by the PCHB stand as an obstacle to the purpose of the federal mining laws.

To determine whether the permit condition is preempted, "we must first determine the purposes and objectives of Congress that are embodied in the [Federal Mining Act of 1872, 30 U.S.C. §§ 21-26]. Second, we must determine whether the [condition] stands as an obstacle to the accomplishment of these Congressional purposes." *South Dakota Mining Ass'n v. Lawrence County*, 155 F.3d 1005, 1009 (8th Cir. 1998).

The Federal Mining Act provides for the free and open exploration of public lands for valuable mineral deposits. 30 U.S.C. § 22. Generally, the purpose of federal mining regulations is for "the encouragement of exploration for mining of valuable minerals located on federal lands, providing federal regulation of mining to protect the physical environment while allowing the efficient and economical extraction and use of minerals, and allowing state and local regulation of mining so long as such regulation is consistent with federal mining law." *South Dakota Mining*, 155 F.3d at 1010.

Federal forest service regulations, including the Federal Mining Act and the Multiple Use Mining Act, 30 U.S.C. § 601, do not preempt a general state environmental regulation requiring a permit for operating a mining claim on federal land. *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 582-95, 107 S. Ct. 1419, 94 L. Ed. 2d 577 (1987).

In *Granite Rock*, the California Coastal Act, California Public Resources § 30000, required any person undertaking development in the state's coastal zone to obtain a permit from the coastal commission, including those wishing to exercise federal mining rights. *Id.* at 576. Granite Rock refused to obtain a permit for its limestone mining operation on federal land within the coastal zone. *Id.* at 576-77. Instead, Granite Rock challenged the permit requirement in federal court, contending that the state law permit requirement was preempted by federal law. *Id.* at 577. The United States Supreme Court concluded that the state law permit requirement, as a means of imposing reasonable environmental regulations on mining operations, was not in conflict with federal law and was not preempted on its face. *Id.* at 594.

However, the Court limited the scope of its decision to the facial challenge presented. *Id.* It pointed out that Granite Rock did not argue that the coastal commission placed any particular conditions on the permit that conflicted with federal statutes or regulations. *Id.* at 579-80. Thus, the Court did not approve any future application of the state permit requirement that conflicted with federal law. *Id.* at 594.

This case presents the issue left open in *Granite Rock*. Specifically, whether the condition on Mr. Beatty's permit conflicts with federal law. As the court noted in

*Granite Rock*, "one may hypothesize a state environmental regulation so severe that a particular land use would become commercially impractical." *Id*. at 587.

The condition on Mr. Beatty's permit and the state regulations supporting the condition do not stand as an obstacle to the accomplishment of the federal mining laws. The general environmental mining regulations imposed in the Pamphlet still allow Mr. Beatty to exercise his federal mining rights, albeit with restrictions. The mining restrictions and permit conditions are designed to protect the physical environment for the development of fish life, which is consistent with the Federal Mining Act.

The restrictions in the Pamphlet do not act as a de facto ban on mining. If the allowable mining methods in the Pamphlet are not suitable or economically viable, a miner may request relaxed mining regulations by completing an application with site specific information and specifications for the proper protection of fish life. *See* WAC 220-110-030. As another layer of protection, any condition placed on the permit to optimize fish life cannot be out of proportion to the proposed project. RCW 77.55.231(1). This provision limits the burden that the WDFW can place on exploration for mining valuable minerals. As applied to Mr. Beatty, he may provide the information needed to obtain an exception from the Pamphlet regulations and modify the

35

conditions imposed on his permit. The mining regulations and the modifiable condition on his permit do not stand as an obstacle to Mr. Beatty's right to mine.

In sum, the condition on Mr. Beatty's permit does not conflict with federal regulations on mineral prospecting. The condition allows for the exploration of public lands for valuable mineral deposits while protecting the physical environment. Furthermore, the efficient and economical extraction of minerals is not obstructed. Mr. Beatty may apply for an exception to the permit conditions and propose a site specific plan that increases his mineral production while protecting fish life.

*Constitutional Challenges.* Mr. Beatty makes two constitutional challenges to the PCHB's approval of the permit. Mr. Beatty contends that the hydraulic mining permit statute, RCW 77.55.021, is unconstitutionally vague because the statute fails to give the WDFW any guidance on the proper scope of review for a permit application. He also contends that he was subject to unconstitutional discrimination.

Mr. Beatty is incorrect. The hydraulic mining permit statute is not unconstitutionally vague. The statute provides an identifiable standard for denying a permit. Former RCW 77.55.021(3)(a) directs the WDFW that protection of fish life is the only grounds upon which approval of a permit may be denied. The WDFW defined fish as all fish species, including food fish and game fish, at all stages of development of those

36

species. Former RCW 77.08.010(17) (2009). "Protection of fish life" is defined as "prevention of loss or injury to fish or shellfish, and protection of the habitat that supports fish and shellfish populations." WAC 220-110-020(79). The statute and definitions provide suitable guidance for the WDFW to deny a permit on the grounds that it endangers the fish population.

Furthermore, the court in *State v. Crown Zellerbach Corp.*, 92 Wn.2d 894, 900-01, 602 P.2d 1172 (1979) held that the statute delegating authority to WDFW was constitutionally enforceable under the delegation of powers principle. The court found the general standards given in the statute were adequate, "particularly in light of our stated view that environmental factors are not readily subject to standardization or quantification." *Id.* at 900. There is no evidence in the record that would support a conclusion that RCW 77.55.021 was unconstitutional as applied to Mr. Beatty.

Mr. Beatty's relies on *Anderson v. City of Issaquah*, 70 Wn. App. 64, 851 P.2d 744 (1993) as authority that a precise standard is needed in the environmental context. Mr. Beatty's reliance is misplaced. *Anderson* is not persuasive. The building code regulations in *Anderson* are not comparable to the hydraulic mining code in WAC 220-110. The words used in Issaquah's building code were not technical words

commonly understood within the industry. *Anderson*, 70 Wn. App. at 77. Nor did the regulations involve environmental factors not subject to standardization.

Mr. Beatty contends that the WDFW unconstitutionally discriminated against him because he was not treated the same as other miners downstream who received permits. Mr. Beatty fails to cite legal authority for his argument. Citations to legal authority and reference to relevant portions of the record must be included in support of issues raised on appeal. RAP 10.3(a)(5). "Without adequate, cogent argument and briefing, this court should not consider an issue on appeal." *Schmidt v. Cornerstone Inv., Inc.*, 115 Wn.2d 148, 160, 795 P.2d 1143 (1990). In any case, there is no evidence of disparate treatment. The miners downstream are not similarly situated to Mr. Beatty because they provided site specific information to WDFW to obtain work window extensions. The WDFW offered Mr. Beatty the same opportunity to explore a site specific solution to obtain a permit extension, but Mr. Beatty refused. Mr. Beatty's discrimination claim fails.

The hydraulic mining permit statute is not unconstitutionally vague. Nor did the WDFW discriminate against Mr. Beatty.

*Adoption of WDFW's Mitigation Policy.* Mr. Beatty contends that the mitigation policy adopted by the WDFW is a "rule" as defined by RCW 34.05.010(16) in

Washington's Administrative Procedure Act, and that the WDFW did not follow prescribed rule-making procedures in adopting a rule.

An agency action constitutes a rule only if it meets the requisite elements in RCW 34.05.010(16). The action must be an agency order, directive, or regulation of general applicability and meet one of the five expressed qualifiers in the definition. RCW 34.05.010(16).

As stated earlier, the WDFW mitigation policy provides, "WDFW shall determine the project impact, significance of impact, amount of mitigation required, and amount of mitigation achieved, based on the best available information, including the applicant's plans and specifications. For large projects with potentially significant impacts, this will be based on review of studies approved by WDFW." Ex. A-36 at 4.

Similarly, "mitigation" in hydraulic permits is defined by rule in WAC 220-110-020(66) and means "actions that shall be required as provisions of the HPA to avoid or compensate for impacts to fish life resulting from the proposed project activity." The definition lists the types of mitigation to be considered and implemented, where feasible, in the following sequential order of preference:

39

(a) Avoiding the impact altogether by not taking a certain action or parts of an action;

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation;

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment;

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action;

(e) Compensating for the impact by replacing or providing substitute resources or environments; or

(f) Monitoring the impact and taking appropriate corrective measures to achieve the identified goal.

WAC 220-110-020(66).

Mr. Beatty neglected to address which of the qualifiers in RCW 34.05.010(16) apply to the WDFW's action in order to classify the internal mitigation policy as a rule. Still, it is clear that the internal mitigation policy is not a new directive to the agency to consider mitigation. The internal policy is a simplified restatement of WAC 220-110-020(66). The much shorter internal mitigation policy simply reiterates the mitigation rule and reminds persons in the WDFW to follow the rule.

In any case, the mitigation policy did not affect Mr. Beatty. The WDFW did not consider mitigation because Mr. Beatty did not submit a mitigation plan to the WDFW or work with them to develop a mitigation plan. Without an influence on the decision, there is no violation.

No. 31409-0-III
*Beatty v. Fish & Wildlife Comm'n*

In conclusion, we find no error with the PCHB's decision on Mr. Beatty's permit.

We affirm the decision of the superior court.

Knodell, J.P.T.

WE CONCUR:

Korsmo, J.

Siddoway, C.J.