# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SOUND ACTION, | No. 56641-9-II |
| Appellant, | |
| v. | |
| WASHINGTON STATE POLLUTION CONTROL HEARINGS BOARD; WASHIINGTON DEPARTMENT OF FISH AND WILDLIFE; and PORT OF SILVERDALE, | UNPUBLISHED OPINION |
| Respondents. | |

VELJACIC, J. — Sound Action seeks to require mitigation measures for a dredging project by the Port of Silverdale. To that end, Sound Action appeals the Pollution Control Hearings Board's (Board) order on partial summary judgment as well as its ruling upholding the Washington Department of Fish and Wildlife's (DFW's) issuance of a hydraulic project approval to the Port. The hydraulic project approval permitted the Port to dredge 17,165 cubic yards at Dyes Inlet in Kitsap County. Sound Action argues that the Board erred in upholding the project approval because (1) the project approval does not require the Port to engage in habitat mitigation and the dredging project does not qualify for an exemption to habitat mitigation under RCW 77.55.271, (2) the project approval does not protect fish life and Sound Action asserts that fish life includes unclassified marine invertebrates, (3) contrary to the Board's analysis, harm to fish life is not measured only on the impact to reproductive capacity of a fish population, (4) the permit fails to

ensure "no net loss" of fish life, and (5) the Board did not qualify Sound Action's sole witness as an expert. Because Sound Action fails to show the Board erred, we affirm.

FACTS

I.     HYDRAULIC PROJECT APPROVAL

In 2019, DFW issued hydraulic project approval (HPA)[1] permit number 2019-6-346+01 to the Port of Silverdale, allowing the Port to conduct maintenance dredging at Dyes Inlet in Kitsap County. The proposed dredging would improve navigation of recreational boaters at low tides by removing 17,165 cubic yards of material within and around an existing boat ramp and moorage area. It would take approximately two days to complete.

In approving the Port's application, DFW considered supporting documents. These documents included a biological evaluation completed by Marine Surveys and Assessments (MSA), an environmental consulting group that assisted the Port with its application. DFW also considered the Port's dredging plan, completed by Coastal Geologic Services, Inc, that showed the footprint of the proposed project area. Finally, DFW considered historical documents and maps issued by the United States Army Corps of Engineers to support that historical dredging had occurred at the site. All these materials were uploaded to a public file.

Environmental group Sound Action[2] filed an informal appeal of the HPA. As a result, DFW reissued the HPA on January 10, 2020, with revised work windows for the protection of migrating juvenile salmon and forage fish spawning.

---

[1] An HPA is a permit of approval issued by DFW "as to the adequacy of the means proposed for the protection of fish life" for a hydraulic project. RCW 77.55.021(1).

[2] "Sound Action is an environmental group with a mission to preserve nearshore habitats. Sound Action reviews HPAs issued for projects in the Puget Sound." Clerk's Papers (CP) at 19.

Because dredging can cause impacts to fish and shellfish through such things as turbidity,[3] entrainment,[4] and noise pollution, the HPA included provisions intended to address potential impacts to fish life. These provisions outlined the type of dredging allowed as well as the method, instructions on equipment operation, work windows, and other requirements:

> **Entrainment**: The permittee must conduct dredging using dredge types and methods that cause the least impacts to fish and shellfish. For dredge areas around the boat ramp and intertidal areas, the permittee must ensure any dredged depressions on the beach have a waterward positive return flow channel such that water can drain and fish can escape entrainment.
> **Turbidity**: The permittee must operate vessels with minimal propulsion power and in adequate water depth to prevent impacts from grounding and propeller wash to sediment. The permittee must operate the mechanical dredging using methods to minimize turbidity. Land-based dredging must be done at low tide.
> **Contaminant releases**: The permittee must prevent contaminants from entering the water.
> **Spawning**: To protect migrating juvenile salmon, and forage fish spawning habitat, the dredging must occur between September 1 through February 15 around and under [the]floating moorage area. To protect spawning surf smelt, the dredging will occur between September 1 through October 15 around the boat ramp, if a [DFW] approved biologist does not detect surf smelt eggs during a beach survey. Access to dredging around the boat ramp must use the boat ramp, on the beach above +5 [mean lower low water] MLLW elevation.
> **Light**: Dredging is limited to daylight hours
> **Direct impacts**: If a fish kill occurs or fish are observed in distress at the job site, the permittee must immediately stop all activities causing harm and notify [DFW].

Admin. Rec. (AR) at 1416-17 (emphasis added) (internal record citations omitted).

II.    ADMINISTRATIVE APPEAL

Sound Action filed a formal appeal of the reissued HPA to the Board arguing that the HPA failed to protect fish life in accordance with chapter 77.55 RCW and failed to comply with

---

[3] Turbidity consists of particles in the water that create an opacity to the water and changes it from what would be clear to opaque.

[4] Entrainment occurs when organisms are taken up along with sediment and water during the dredging process and trapped.

mitigation requirements under chapter 220-660 WAC. The Board determined that under the larger question of whether DFW properly issued the HPA to the Port, five issues were before it.

> 1. Did the Washington Department of Fish and Wildlife ([DFW]) properly issue Hydraulic Project Approval No. 2019-6-346+02 (the HPA) under RCW 77.55 and WAC 220-660?
> a. Does the HPA adversely affect fish life and thus contravene RCW 77.55.021?
> b. Does the HPA contravene WAC 220-660-080 by not achieving *no net loss* through avoidance, minimization, or compensation for adverse impacts to fish life, including but not limited to impacts to saltwater habitats of special concern?
> c. Does the HPA contravene WAC 220-660-320(2)(b) by allowing forage fish spawning areas, aquatic vegetation, benthic and epibenthic habitat, and areas important for salmonid migration, rearing, and feeding to be removed through dredging and by allowing interference with littoral processes in an accretion zone?
> d. Does the HPA contravene WAC 220-660-410(3)(b) by allowing the project's design and expansion without following the mitigation sequence to avoid or minimize the conversion of intertidal to subtidal habitat?
> e. Does the HPA contravene WAC 220-660-410(3)(c) by authorizing new dredging in sand lance and surf smelt spawning habitats?

AR at 45-46 (emphasis added). The Port and DFW sought summary judgment on all issues before the Board.

The Board granted partial summary judgment to DFW and the Port on four of the five issues, issues 1.b.-e. The Board concluded that the dredging proposed by the Port constituted maintenance dredging as it would occur in an existing channel or berthing area and would occur within a historic dredging footprint. Therefore, the project was subject to an exemption under the hydraulic code, chapter 77.55 RCW, from habitat survey and mitigation requirements.[5]

The Board determined that issue 1.a., that "ask[ed] whether the HPA directly impacts fish life, thus contravening RCW 77.55.021" would proceed to a hearing. AR at 1323. The Board ruled that material issues of fact remained as to whether the HPA included adequate steps to

---

[5] RCW 77.55.271 is the exemption and states in relevant part: "This chapter shall not be construed to require habitat mitigation for navigation and maintenance dredging of existing channels and berthing areas."

prevent a direct impact to fish life at the project site. Although the project provided for work windows for the dredging, the Board stated that "[m]erely changing the timing of dredging d[id] not address all the potential impacts noted in the Rules, and []DFW has not presented evidence of other measures taken to prevent direct impacts." AR at 1324.

III.    ADMINISTRATIVE HEARING

On November 18-20, 2020, the Board held a virtual hearing on issue 1.a.

Sound Action relied on the testimony of its executive director, Amy Carey. Carey's work focuses on the hydraulic code and reviews of HPA permits specific to marine nearshore waters. Carey has personally reviewed more than 3,000 HPAs.[6] Carey has worked in habitat protection and regulatory oversite for more than a decade and regularly gives presentations to marine recovery focused entities and is an avid researcher. During the hearing, Sound Action's counsel asked Carey how she prepares herself "to understand the science that is occurring in those nearshore ecosystems?" AR (Rep. of Proc. (RP) (Nov. 18, 2020)) at 23. Carey explained that Sound Action has "decades of sort of working in the field and sort of having that constant commitment to staying up to date on research and the science and the species and continuing education on that." AR (RP (Nov. 18, 2020)) at 23. Carey testified that she did not have a college degree and that she had not visited Dyes Inlet specific to the proposed dredge.

Sound Action requested to qualify Carey "as an expert witness on nearshore ecology and development impacts." AR (RP (Nov. 18, 2020)) at 32. The presiding officer ruled that "[b]ased on Ms. Carey's experience reviewing HPAs and as an advocate for the nonprofits, and *considering her lack of formal education*, I would say in this case Ms. Carey is limited in her expertise with

---

[6] In addition to testimony, the record contains Carey's resume that outlines her experience working with nearshore projects. The record also includes her declaration detailing her relevant experience, knowledge, and the documents on which she relied when giving her testimony.

regard to biology and the biological functions of fish and fish life and nearshore habitats." AR (RP (Nov. 18, 2020)) at 33 (emphasis added). The presiding officer determined, however, that "with regard to [Carey's] experience in reviewing HPAs and on the committees and boards . . . that she is a part of . . . and in her advisory group on the hydraulic code, she does bring her practical expertise and experience. And I think that that [sic] sort of information is helpful to the Board and can come in." AR (RP (Nov. 18, 2020)) at 33. The presiding officer stated that DFW and the Port could raise objections to specific opinions and those would be addressed at that time. The Board also determined that Sound Action's attorney would be permitted "some latitude with regard to Ms. Carey's testimony." AR (RP Nov. 18, 2020)) at 39. The presiding officer stated:

> Per the Board's relaxed rules of evidence and based on [Carey's] practical experience, her testimony, and what is most helpful to the Board, as long as [counsel for Sound Action] can lay a foundation for her responses, I'm going to give some latitude to the subject matter that he can cover."

AR (RP (Nov. 18, 2020)) at 39. During her testimony, Carey opined on salmon behavior, nearshore environments, the presence of certain fish species at the project site, vegetation, including the presence of macroalgae, dredging impacts, and mitigation efforts by DFW.

In reviewing the HPA, Carey relied on "all documents in the [DFW] APPS[7] project file and also utilized publicly available [Geographic Information System] GIS mapping sets, historic aerial photos, various habitat inventories and [her] personal knowledge of the Dyes [I]nlet area to assess ecosystem impacts from the proposed [project]." AR at 349. Carey also relied on discovery responses and additional scientific literature specific to dredging impacts on habitats and fish and shellfish. Carey testified that the project site had a documented presence of forage fish spawning, salmon streams, vegetation and nearshore geomorphic process and landforms. Carey concluded

---

[7] The [DFW] APPS site . . . is the website portal for all HPA permits." AR at 349.

based on her review that "the project site . . . contain[ed] both surf smelt and sand lance spawning habitat, a significant volume of submerged aquatic vegetation, the presence of an accretion shoreform and documented herring spawning habitat that is adjacent to the project area." AR at 349.

Carey acknowledged that "compensatory mitigation for direct impact to fish is not fish by fish. There's never a project that you could quantify specifically how many shellfish or fish were killed or harmed." AR (RP (Nov. 19, 2020)) at 273. Carey stated that,

> What you look at under the hydraulic code and that net loss is you're recognizing that there is impact. You avoid, you minimize, and then you compensate. But, again, it's not fish by fish . . . .
>        And I would say that it's quite common to have compensatory mitigation—under my review of thousands of HPA permits, it's quite common to have compensatory mitigation in cases like this. And I've never seen a situation where that was dependent on somebody counting fish or shellfish that were harmed or killed.

AR (RP (Nov. 19, 2020)) at 273.

Randi Thurston, a current compliance division manager at DFW and former protection division manager in DFW's Habitat Program, was responsible for policy and rulemaking related to HPAs. Thurston testified that HPAs include technical provisions to mitigate the harm to fish life. Thurston explained that mitigation "is avoidance, minimization, and then compensating for remaining impacts." AR (RP (Nov. 19, 2020)) at 323. In assessing whether mitigation is required, DFW looks to research, site-specific characteristics, and the type of work that will occur. In calculating the risk to fish life, a consideration, is presence of fish life.

During the hearing, Thurston explained DFW's "no net loss" standard for impact to fish life. AR (RP (Nov. 19, 2020)) at 336. Thurston stated:

> It really applies to the—the reproductive capacity or productive capacity of the stock. . . . I think we recognize that any time somebody does something in the

7

water, there's a risk to fish life. Because . . . fish are present unless . . . the work is being done in headwater stream above fish presence.

So what we're looking at is, you know, is the project—would the project be significant enough to cause a loss of productive capacity for the stock or the population, and that's reflected in our mitigation policy.

So what we're looking at is, you know, is the project—would the project be significant enough to cause a loss of productive capacity for the stock or the population, and that's reflected in our mitigation policy.

AR (RP (Nov. 19, 2020)) at 336.

Nam Siu, a habitat biologist for DFW and expert in marine ecology, reviewed the Port's application materials, including project plans, dredge plans, the biological evaluation, and the application. Siu also reviewed applicable provisions of the hydraulic code as well as geographical maps, and forage fish and spawning maps. Siu determined that the Port's application materials were consistent with his personal knowledge of Dyes Inlet. Siu stated that, because the project was a maintenance dredging project, he knew that the baseline condition of the site would not be an undeveloped or pristine habitat. Siu visited the marina and what he found was consistent with what he expected to find at a previously dredged site. Siu conducted a dive at the proposed dredge area and spoke with his supervisor who confirmed that the project site was previously dredged. Siu testified that

it was [his] assumption that [the marina] had been dredged before, that means that the bottom is deeper than the surrounding areas. And this causes, basically, a sink effect. You know, everything that is really fine and small in terms of sediment tend to get trapped and settle in these deeper areas. And that's in fact, what [he] observed when [he] dove under the marina. It's a silty, muddy mess.

AR (RP (Nov. 20, 2020)) at 27-28. Siu stated that the majority of the dock areas, 95 percent, consisted of "mud muck." AR (RP (Nov. 20, 2020)) at 102. Siu found trash under the dock, including "shopping carts that kids pushed off the edge, things that fell off people's boats. . . . There was a significant amount of trash under that. So it's a highly impacted area." AR (RP (Nov. 20, 2020)) at 157.

Siu testified that the sediment under the dock was "devoid of oxygen. It's what we call anoxic." AR (RP (Nov. 20, 2020)) at 53. Therefore, the area was "not very conducive to any life" and "there would be little to no infauna or epibenthic fauna in that sediment because of the lack of oxygen exchange in the sulphurous environment." AR (RP (Nov. 20, 2020)) at 53. Siu identified sand lance, surf smelt, chum salmon, coho salmon, and clams as species that were at potential risk of impact from the dredging. Siu testified that "[i]n that lower intertidal where they're proposing to dredge . . . that's not typically an area that's super dense or rich in clams," explaining that the type of sediment found there was very fine. AR (RP (Nov. 20, 2020)) at 56. Siu did state that at the site of the piling of the dock, shell hash from the barnacles on the piling could coarsen the sediment and he had observed horse clams. He stated that he also observed crabs, but they are relatively mobile and could "scurry away real quick." AR (RP (Nov. 20, 2020)) at 54.

Siu described the habitat around the boat ramp as sand with pea gravel. At the boat ramp, Siu believed that the risk for entrainment of finfish was low as the proposed dredging would take place at the boat ramp only during low tide.

Siu understood that mechanical dredging with a clamshell or excavator would be used for the project. A clamshell dredger would be used around the deep subtidal areas of the dock. An excavator would be used around the intertidal area of the boat ramp. Siu believed that the risk to finfish and shellfish of entrainment on the beach during dredging was low. He testified that under the HPA, dredging could only take place during low tide, so finfish would not be located on the beach. He testified that entrainment of shellfish would also be of low concern, because of the elevations at which dredging would occur was not the typical elevation for shellfish. Siu stated that his research showed documentation of forage fish, including surf smelt and sand lance, at the site so the risk to forage fish in the intertidal area, of the boat ramp, was a concern. He stated,

9

however, that the boat ramp was below documented spawning elevations for the forage fish. According to Siu, once fish have spawned and the tide goes out, the fish go with the tide and eggs stay on the beach. Siu testified that the limitations in the HPA on when dredging can take place, as well as limitations on where and how to access the dredging site, were included in order to protect the eggs and the elevation at which spawning occurred.

Amy Leitman is the lead marine biologist at consulting firm MSA and co-authored the biological evaluation for the project. Leitman is an expert in nearshore marine biology, marine subtidal biology, and environmental regulatory compliance. The Port hired MSA to conduct a habitat survey of the boat ramp area as well as the mooring area where the dredge would occur. Leitman and other members of MSA completed "fairly extensive surveys of the [marina], both on the beach and in the intertidal and in the subtidal areas near the moorage and by the boat ramp." AR (RP (Nov. 19, 2020)) at 391. Leitman stated that the team "always identif[ies] the species that we note, whether they are of concern by the State or the . . . federal government or not." AR (RP (Nov. 19, 2020)) at 391. Leitman described Dyes Inlet as "fairly barren" due to the lack of kelp. AR (RP (Nov. 19, 2020)) at 394. She stated that there are finer sediments toward the lower intertidal and subtidal areas. She stated the area was not prolific in terms of invertebrates.

Similar to Siu, Leitman stated that under the docks, the survey team saw "mostly sand and mud." AR (RP (Nov. 19, 2020)) at 406. She stated that in the muddier areas, it is uncommon to find species like crabs, clams, and flatfish. In the moorage area, she saw Gracilaria and sea cucumbers, but no crab or clams. The team also observed drift ulva, a species of macroalgae. Leitman did not see any tube worms, shrimp, mud shrimp, crabs, or clams. She stated that the team did not dig into the sediment. Specific to the boat ramp, the sediment consisted of "more sand and shell." AR (RP (Nov. 19, 2020)) at 409. Leitman saw no fish life around the boat ramp.

Regarding direct impacts on fish, Leitman opined that the impact on the marina habitat would be temporary and that fish life would be impacted to an insignificant degree. She explained that any turbidity from the digging would be unlikely to cause an impact to fish. Leitman testified that her "understanding is there has to be a sustained turbidity plume to create impacts to fish. . . . [She] believe[s] [the dredging is] only going to take a couple of days." AR (RP (Nov. 19, 2020)) at 423-24.

Leitman testified that entrainment was the area in which there was the "most unavoidable impact to the habitat." AR (RP (Nov. 19, 2020)) at 426. Leitman explained, "[b]ecause you are going to be removing substrate, which is below the surface, that will, whether I see it or not, contain some level and some quantities of infaunal invertebrates, those animals that live in the sediment. And you—you can't avoid that. Because you're removing the sediment." AR (RP (Nov. 19, 2020)) at 426. Regarding fish or crab, Leitman stated that although they did not see any, if they were there, she foresaw no impact. She also foresaw minimal impact to sea cucumbers, though other infaunal organisms would be impacted. Leitman did not see sand lance and believed it would be unlikely that they would be in the boat moorage area because the soil is not well aerated. Leitman stated her expert opinion is that the dredge would not entrain sand lance and forage fish because she did not believe they would be living in silt and mud, which is inappropriate habitat. Leitman testified that sand lance were more likely to be found near the boat ramp where the sediment was not as fine. She stated that the HPA had work window restrictions in place to avoid, for the greatest part, when other species were in the area and when migration or spawning might be impacted.

IV.    Board's Order In Favor Of DFW

On March 3, 2021, the Board entered its findings of fact, conclusions of law, and order affirming the HPA.  The findings challenged on appeal include:

1.

[DFW] originally issued the HPA on August 16, 2019, to Respondent Port of Silverdale, authorizing maintenance dredging in Dyes Inlet.  The dredge project (Project) *includes maintenance dredging* of up to 17,165 cubic yards around an existing boat ramp and moorage area.  The purpose of the dredging is to improve navigation at low tides.
. . . .

7.

Carey's testimony included summarizing general information on fish and shellfish in Puget Sound she had acquired from scientific articles.  Carey opined on the presence of specific species of fish, shellfish, and invertebrates she would expect to find at the site, and potential impacts to those species she believes would result from the dredging Project.  *Carey relied on high level general maps and research articles from other sites to make her conclusions on the presence of fish and shellfish species and potential dredge impacts.*
. . . .

9.

The Presiding Officer ruled Carey did not qualify as an expert in biology but could testify as to her experience reviewing HPAs, the knowledge of the HPA process, and her role as an advocate working with state and non-profit agencies developing the Hydraulic Code.  Although Carey has experience reviewing HPAs through her advocacy work, the Board finds and concludes that *Carey's opinions outside of her expertise were not persuasive*.
. . . .

14.

Dredging has the potential to affect ecological functions of marine organisms, including fish.  Potential dredging effects to fish include entrainment, and impacts from turbidity, contaminant releases, noise, and habitat changes.  In the case of maintenance dredging, *entrainment mortality risk*, turbidity, and behavioral and noise effects *tend to be temporary and localized*.
. . . .

17.

*Mechanical dredging has less determinantal effects on marine life than hydraulic dredging* because it occurs at a slower rate and does not have the vacuum effect of hydraulic dredging.  The slower rate of sediment removal provides greater opportunity for organisms to escape.  *Finfish will swim away from the dredging activities* and are not likely to be entrained with a mechanical clamshell dredge.  Organisms with lower motility have a greater risk of entrainment mortality.
. . . .

19.

Turbidity temporarily increases at varying levels near operating dredges. Mechanical clamshell dredging creates less turbidity than hydraulic dredging.

. . . .

21.

Chemical releases or contaminant mobilization can occur as a result of dredging and may cause long-term effects. Sediment in the Project area has exceeded screening levels for some chemicals, but *the scooping method of mechanical clamshell dredging removes contaminated sediments with less turbidity than other methods of dredging*. Any impacts from contaminated sediments would be fleeting and temporary.

. . . .

25.

*Siu described the Project site as muddy and devoid of submerged aquatic vegetation, with primarily fine sediment*. In his initial survey in 2015, Siu observed signs of high use of the Project area, such as trash under the dock, including shopping carts.

. . . .

29.

Siu noted that sand lance burrowing presents a heightened risk of entrainment from dredging. However, sand lance prefer well-drained coarse sand to finer sediments with less oxygen. *Therefore, sand lance are less likely to be found in the dredging area around the boat ramp, where the sediment is predominantly fine-grained*. In addition, sand lance and surf smelt lay their eggs in the upper intertidal area of the beach. The proposed dredging is below documented surf smelt and sand lance spawning elevations in the intertidal zone.

AR 1406-1415 (emphasis added) (internal citations omitted) (footnotes omitted).[8]

Sound Action petitioned Thurston County Superior Court for judicial review of the Board's partial summary judgment order, and the findings of fact, conclusions of law, and order entered following the administrative hearing. The superior court upheld the Board's decision.[9]

Sound Action appeals.

---

[8] The Board also made detailed conclusions of law. A number of the conclusions of law are also challenged, 2, 7, 8-24, however, they are referenced within the analysis.

[9] The superior court determined that Carey appeared to be qualified as an expert in nearshore ecology and development. Therefore, the court held that the Board acted arbitrarily and capriciously when it denied Sound Action's request to qualify her as an expert. The court determined, however, that the error was harmless.

13

ANALYSIS

I.     STANDARD OF REVIEW

The Washington Administrative Procedure Act (APA) governs judicial review of a final administrative decision. RCW 34.05.510; *Stewart v. Dep't of Emp. Sec.*, 191 Wn.2d 42, 48-49, 419 P.3d 838 (2018). We sit in the same position as the superior court and apply the standards of the APA directly to the administrative record. *Tapper v. Emp. Sec. Dep't.*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). Therefore, we apply de novo review of the agency's order. *Wash. State Hosp. Ass'n v. Dep't. of Health*, 183 Wn.2d 590, 595, 353 P.3d 1285 (2015). The challenging party bears the burden of demonstrating that an agency erred. *Hardee v. Dep't. of Soc. & Health Servs.*, 172 Wn.2d 1, 6, 256 P.3d 339 (2011).

The bases for invalidating an agency's decision include when "[t]he agency has erroneously interpreted or applied the law." RCW 34.05.570(3)(d). "Where a party challenges the [Pollution Control Hearings Board's] application of the law to a particular set of facts, 'the factual findings of the agency are entitled to the same level of deference which would be accorded under any other circumstances.'" *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 588, 90 P.3d 659 (2004) (quoting *Tapper*, 122 Wn.2d at 403). Application of the law to the facts is a question of law reviewed de novo. *Id*. at 588. This error of law standard permits a reviewing court to substitute its own judgment for that of the agency, however, substantial weight is given to the agency's view of the law it administers. *Safeco Ins. Cos. v. Meyering*, 102 Wn.2d 385, 390, 687 P.2d 195 (1984); *Beatty v. Wash. Fish & Wildlife Comm'n*, 185 Wn. App. 426, 443, 341 P.3d 291 (2015). We apply de novo review to questions of statutory interpretation. *Wash. State Hosp. Ass'n*, 183 Wn.2d at 595. If a statute is ambiguous and "falls within the agency's expertise, the agency's interpretation of the statue is 'accorded great weight, provided it does not conflict with

the statute.'" *Port of Seattle*, 151 Wn.2d at 587 (quoting *Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't. of Ecology*, 146 Wn.2d 778, 790, 51 P.3d 744 (2002)).

We may also grant relief from an agency order if "[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court." RCW 34.05.570(3)(e). Substantial evidence means "'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" *Port of Seattle*, 151 Wn.2d at 588 (internal quotation marks omitted) (quoting *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000)). An agency's factual findings will be overturned only if clearly erroneous. *Id*. We do not reweigh the evidence or substitute our judgment for that of the Board. *Id*.

Additionally, we may grant a party relief from judgment if the agency's order was "arbitrary or capricious." RCW 34.05.570(3)(i). An agency action is arbitrary or capricious when it "'is willful and unreasoning and taken without regard to the attending facts or circumstances.'" *Port of Seattle.*, 151 Wn.2d at 589 (internal quotation marks omitted) (quoting *Wash. Indep. Tel. Ass'n v. Wash. Utils. Transp. Comm'n*, 149 Wn.2d 17, 26, 65 P.3d 310 (2003)). "Where there is room for two opinions, and the agency acted honestly and upon due consideration, [we] should not find that an action was arbitrary and capricious, even though [we] may have reached the opposite conclusion." *Id*.

II.     LEGAL BACKGROUND—THE HYDRAULIC CODE AND HYDRAULIC RULES

A "hydraulic project" is "the construction or performance of work that will use, divert, obstruct, or change the natural flow or bed of any of the salt or freshwaters of the state." WAC 220-660-030(78). The hydraulic code requires a government agency to obtain an HPA from DFW before undertaking a hydraulic project. RCW 77.55.021. This permit ensures that the project

15

adequately provides for the protection of fish life. RCW 77.55.021; WAC 220-660-010. "Protection of fish life" is defined as "avoiding, minimizing unavoidable impacts, and compensating for remaining impacts to fish life and the habitat that supports fish life through mitigation sequencing." WAC 220-660-030(121).

RCW 77.55.021(7)(a) outlines that "[p]rotection of fish life is the only ground upon which approval of a permit may be denied or conditioned. Approval of a permit may not be unreasonably withheld or unreasonably conditioned." The legislature also requires that any conditions imposed by DFW should be "reasonably related to the project," stating:

> Conditions imposed upon a permit must be reasonably related to the project. The permit conditions must ensure that the project provides proper protection for fish life, but the department may not impose conditions that attempt to optimize conditions for fish life that are out of proportion to the impact of the proposed project.

RCW 77.55.231(1)(a).

The hydraulic rules outline technical provisions, stating that "[i]mplementing these provisions is necessary to minimize project-specific and cumulative impacts to fish life." WAC 220-660-020. These provisions apply to a hydraulic project when they are included in the HPA. WAC 220-660-020. In addition, the rules require that "[a]ll hydraulic projects must also meet the applicable mitigation requirements in WAC 220-660-080." WAC 220-660-020.

Notwithstanding the mitigation requirements, the legislature has provided that *habitat mitigation* is not required for "maintenance dredging of existing channels and berthing areas." RCW 77.55.271. The applicable exception, reads:

> The department shall not require mitigation for sediment dredging or capping actions that result in a cleaner aquatic environment and equal or better habitat functions and values, if the actions are taken under a state or federal cleanup action.
> *This chapter shall not be construed to require habitat mitigation for navigation and maintenance dredging of existing channels and berthing areas.*

16

RCW 77.55.271 (emphasis added).

III.     THE BOARD DID NOT ERR IN CONCLUDING ON SUMMARY JUDGMENT THAT DFW
         PROPERLY ISSUED THE HPA FOR MAINTENANCE DREDGING.

Sound Action challenges the Board's decision on summary judgment that the exclusion for

habitat mitigation found in RCW 77.55.271 applies to the Port's dredging project.[10]  Sound Action

contends that the dredging proposed by the Port is not of an existing channel or berthing area, and

therefore is not maintenance dredging.  Sound Action also argues that there is no evidence that

17,165 cubic yards of dredging material has been dredged from the boat ramp and moorage area

in the past, which it asserts is a requirement for the dredging to be considered maintenance

dredging.  Because the proposed dredging at the marina is dredging of an existing channel or

berthing area and because evidence shows that historical dredging occurred in the same dredge

footprint, we affirm.

A.     Summary Judgment Principles

The Board determined on summary judgment that the statutory exclusion found in RCW

77.55.271 prohibited DFW from requiring habitat mitigation for the Port's dredging project.

"[W]here the original administrative decision was on summary judgment, the reviewing court must

overlay the APA standard of review with the summary judgment standard."  *Verizon Nw., Inc. v.

Emp. Sec. Dep't*, 164 Wn.2d 909, 916, 194 P.3d 255 (2008).  We view the facts "in the light most

favorable to the nonmoving party" and will grant summary judgment "only where the undisputed

facts entitle the moving party to judgment as a matter of law."  *Id*.  We apply de novo review to

the facts in the administrative record and we review the Board's legal conclusions under the "error

of law" standard.  *Id*.  As noted above, the "error of law" standard permits a reviewing court to

---

[10] This argument relates to Board issues 1 b, c, d, and e, as listed above.

substitute its own judgment for that of the agency, however, substantial weight is given to the agency's view of the law it administers. *Safeco Ins. Co.*, 102 Wn.2d at 390; *Beatty*, 185 Wn. App. at 443.

> B.     Existing Channel and Berthing Area

The habitat mitigation exemption at issue in this case states: "This chapter shall not be construed to require habitat mitigation for navigation and maintenance dredging of existing channels and berthing areas." RCW 77.55.271.

Maintenance dredging is not defined by the statute, but the Board adopted the following definition for the term: "'the act of digging as needed for property upkeep.'" AR at 1316. (internal record citation omitted). Below, the Board observed that Sound Action did not challenge this definition. We also adopt this definition for purposes of this analysis.[11]

Before the Board and on appeal, the parties disputed the meaning of the terms "channel" and "berthing area," which are also not defined by statute. We rely on a similar definition to that provided by the parties and found in Webster's Third International Dictionary, which reflects that the term "channel" refers to a deeper part of a harbor or waterway. The term is defined as, "the deeper part of a moving body of water (as a river, harbor, or strait) where the main current flows or which affords the best passage." WEBSTER'S THIRD NEW INT'L DICTIONARY, 374 (2002). Sound Action also cites *Black's Law Dictionary* definition of "channel," which defines the term as "the line of deep water that shipping vessels follow." BLACK'S LAW DICTIONARY, 247 (2004).

---

[11] On appeal, Sound Action challenges the Board's definition, arguing that "maintenance dredging" may only occur in the same footprint as a prior dredge. It does not, however, proffer another definition for the term. Because the Board's definition narrowly defines the term and does not mandate that maintenance dredging must occur in the same footprint or may occur outside of it, we adopt the Board's definition.

"Berthing area" is not found in the dictionary. "Berth," has a number of definitions. As a noun, "berth" means "the place where a ship lies when at anchor or at a wharf," "the place in a shipyard where a ship is built" or "a space designed to accommodate an automotive vehicle (as a truck or train or plane)." WEBSTER'S THIRD NEW INT'L DICTIONARY, 207 (2002). As a verb, the terms "berth" or "berthing" mean "to bring to anchorage: MOOR: maneuver to a suitable place for anchoring or docking." WEBSTER THIRD NEW INT'L DICTIONARY, 207 (2002).

Sound Action provides definitions for the term "ship," referenced in the definitions above. Webster's Third International Dictionary defines "ship" as "any large seagoing boat" or "a boat intended or used for navigation and propelled by power or sail." WEBSTER'S THIRD NEW INT'L DICTIONARY, 2096 (2002).

Sound Action argues that the exception found in RCW 77.55.271 "applies to more commercial scale shipping in deeper waters than the areas around Port's recreational marina elements of a boat ramp and floating moorage." Br. of Appellant at 35. Sound Action emphasizes that a "channel" is a portion of water through which a ship would travel or that is the deeper part of a harbor or waterway, both of which are not applicable in this case. Sound Action further contends that a "berthing area" would signify the place where *a ship* would come to rest, such as at anchor or at a wharf. Based on this strict adherence to the dictionary language, Sound Action argues that the mitigation exemption does not apply to dredging for small recreational boats at a shoreline marina like that subject to the HPA here.

On the other hand, DFW acknowledges that while "channel" can refer to a shipping channel, it also may refer to water that is at a greater depth than the surrounding areas, for example like the access to a boat ramp. DFW emphasizes that the term "berthing area" refers to the *place* where an object is brought to rest, which would include a moorage, anchorage, or docking area.

19

DFW contends that a boat ramp permits boats to enter the marina and travel to deeper water to moor, and there must be a deeper entrance or channel relative to the surrounding areas.

Here, there is nothing in the plain language of RCW 77.55.271 that supports that the legislature desired to confine the statutory exemption to a commercial context or one confined to deep channels through which ships could pass. The exemption simply refers to "existing channels" and "berthing areas" without additional preconditions. Looking to the common sense meaning of the terms, a recreational boat at a marina is required to have a clear passageway through which to pass in order to moor or reach a boat ramp. Further, a boat may be placed in a berthing area in the same manner that a ship, car, or train may be brought to rest. The language of the statute is unambiguous and provides no indication that the narrow interpretation advocated by Sound Action should be applied. Therefore, we uphold the Board's determination that the legislature provided a broad exclusion from habitat mitigation for maintenance dredging.

Sound Action raises additional arguments, arguing that maintenance dredging of marinas is addressed elsewhere in the hydraulic code. Sound Action also argues that applying the exemption language to a marina would lead to its application at any dock located in the Puget Sound. This opinion briefly addresses the first argument.

Sound Action argues that the legislature addressed maintenance dredging of marinas in RCW 77.55.151 "indicating a desire to treat [marinas] differently and to require mitigation for impacts above a threshold amount of maintenance dredging." Br. of Appellant at 38-39.

RCW 77.55.151 provides:

(1) Upon application under RCW 77.55.021, the department shall issue a renewable, five-year permit to a marina or marine terminal for its regular maintenance activities identified in the application.
(2) For the purposes of this section, regular maintenance activities may include, but are not limited to:

20

   (a) Maintenance or repair of a boat ramp, launch, or float within the existing footprint;
   (b) Maintenance or repair of an existing overwater structure within the existing footprint;
   (c) Maintenance or repair of boat lifts or railway launches;
   (d) Maintenance or repair of pilings, including the replacement of bumper pilings;
   (e) Dredging of less than fifty cubic yards;
   (f) Maintenance or repair of shoreline armoring or bank protection;
   (g) Maintenance or repair of wetland, riparian, or estuarine habitat; and
   (h) Maintenance or repair of an existing outfall.
   (3) The five-year permit must include a requirement that a fourteen-day notice be given to the department before regular maintenance activities begin.
   (4) A permit under this section is subject to the application fee provided in *RCW 77.55.321.

From its plain language, RCW 77.55.151 provides for the issuance of five-year renewable permits for regular maintenance activities at marina or marina terminals. The statute is limited to addressing certain types of regular maintenance activities. Specifically, with regard to dredging, the statute addresses amounts of less than fifty cubic yards. RCW 77.55.151(2)(e). RCW 77.55.151 is not applicable to a dredging project of more than 17,000 cubic yards, nor should it be read to be the exclusive provision for dredging projects. *Dep't. of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002) (stating that we give effect to the plain meaning of a statute when the statute's meaning is plain on its face). RCW 77.55.271 specifically mentions a statutory exclusion and does not limit its application to a certain amount of dredging, section .151 notwithstanding. In this case, we agree that the project at issue consists of a navigation channel and berthing area. Therefore, an exclusion from habitat mitigation applies pursuant to RCW 77.55.271 if the prerequisite historical dredging exists.

C.  Historical Dredging at the Marina

The Board determined on summary judgment that dredging would occur in the same footprint as historic dredging. The Board also stated in its findings of fact after the administrative

hearing that the dredge project would include 17,165 cubic yards of maintenance dredging. On appeal, Sound Action argues that there is no evidence that the amount of 17,165 cubic yards has been dredged before nor that the dredging occurred in a historic dredging footprint. DFW responds that the facts in the record support that prior dredging occurred, and Sound Action failed to present any evidence to the contrary. DFW also argues that the absence of documentation that 17,165 cubic yards was removed, does not prove the dredging would not occur in a historic footprint, as it is possible an increased amount of material must be removed in order to maintain the marina's usability. Because evidence supports that a historical dredge of the same *footprint* occurred, and Sound Action fails to present evidence to the contrary, we affirm.

Sound Action argues that there is no record confirming that a large historic dredge took place and the only evidence confirming amounts dredged from the marina, includes reports showing 3,884 cubic yards of material was dredged in 1993 and 3,950 cubic yards in 2005.[12] In so arguing, Sound Action relies on the absence of evidence showing a similar amount of removed dredged material.

The evidence in the record supports that a larger dredge took place in the past and that the proposed dredge project will occur within the same footprint. A 1986 notice informed the public that the Port sought approval for the dredging of 4 acres at the marina. The notice states that "approximately 15,600 cubic yards of sand/gravel" would be dredged. AR at 176. The work encompassed a pier, floating breakwater, and boat launch ramp. In 1989, the United States Army Corps of Engineers issued a letter stating that the full work detailed in the Port's application had

---

[12] In addition, Carey found a 1991 United States Army Corps of Engineers Dredge Material Management Office (DMMO) suitability decision for 21,000 cubic yards of dredged material from the Port. Sound Action argues that a suitability decision for 21,000 cubic yards of material would be unnecessary if a larger dredge had previously occurred as was asserted by DFW.

not been completed, and the Corps included an "as-built" drawing showing the boat ramp marked with an "X." AR 182-83. The boat ramp was not completed at the time and was later permitted and constructed. Maintenance dredging after construction of the moorage and boat ramp occurred in 1993 and 2005.

Evidence from the Kitsap County Department of Community Development also supports that historic dredging occurred. In 2005, the Kitsap County Department of Community Development provided a shoreline exemption for maintenance dredging to the Port. The letter granting the exemption stated:

> This letter is by way of a response to your request for a shoreline permit exemption for maintenance dredging at the Port of Silverdale boat launch and the transient moorage docks. *Shoreline permits were issued for the original dredging in 1985 and 1993. . . .* The dredging currently being proposed is within the original dredge basis and is within the 'scope and intent' of the previously issued permits.

AR at 457 (emphasis added). In 2018, the Kitsap County Department of Community Development issued a determination of nonsignificance for the dredging proposed by the Port, stating that "[a]ll dredging will be within the footprint and depth of the original 1989 approval." AR at 77.

Finally, DFW and MSA experts both concluded that the proposed dredging would occur within the footprint of historical dredges. Leitman declared:

> The area to be dredged under [the Port] plan falls entirely within the footprint of the previous dredging. In the case of the boat ramp, the proposed dredging also falls with[in] the footprint of the 2005 dredging. The footprint of the floating moorage is much smaller than the original 1986 dredge footprint, but certainly within it. Given the built up of sediment since 2005, or 1989 in some areas around the floating moorage, maintenance dredging is necessary to provide access to recreational boaters.

AR at 81 (internal record citations omitted). Siu agreed the dredging "appeared to be within the boundaries of previous dredge events." AR 207.

Here, DFW presented evidence that dredging occurred in the past and within the footprint of the proposed dredging. DFW relied on the testimony of DFW and MSA employees who examined the historical documents. Both Leitman and Siu declared that the area proposed to be dredged would occur within the footprint of the original dredging. There is also significant evidence that anywhere from 15,000 to 21,000 cubic yards of material were removed from the footprint. Sound Action presents no evidence to the contrary. Viewing the evidence de novo, in the light most favorable to Sound Action, we conclude that the Board did not err in finding no issue of material fact that the dredging for the proposed project will occur within the historic dredging footprint and will remove a volume of material consistent with what has been removed previously. Accordingly, there was no error of law and summary judgment was appropriate.

IV.   PROTECTION OF FISH LIFE

The Board held that DFW followed the hydraulic code regarding issue 1.a.—protection of fish life. Sound Action challenges this holding, arguing that the Board erred in concluding that (1) unclassified marine invertebrates do not qualify as unclassified shellfish for purposes of assessing direct impacts to fish life under RCW 77.55.021, (2) "no net loss" is determined by looking at the impact on the reproductive capacity of a fish species, and (3) DFW complied with the mitigation sequence and achieved "no net loss" for the proposed dredging project.

A.   Unclassified Marine Invertebrates are Not "Shellfish"

First, Sound Action argues that the Board erred in concluding that unclassified marine invertebrates are neither fish nor shellfish. Sound Action argues that these invertebrates are unclassified *shellfish* that the Port is required to protect. DFW responds that the HPA properly omits protections for unclassified marine invertebrates. Because nothing in the hydraulic rules provide that unclassified marine invertebrate are shellfish, we affirm.

24

Substantial weight is given to the agency's view of the law it administers, especially when the issue falls within the agency's expertise. *Southwick, Inc. v. Dep't of Licensing Bus. & Pros. Div.*, 191 Wn.2d 689, 695, 426 P.3d 693 (2018); *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 325, 646 P.2d 113 (1982); *Beatty*, 185 Wn. App. at 443. DFW has the authority to "[c]lassify[] species of marine and freshwater life as food fish or shellfish" and "[c]lassify[] the species of wildlife, fish, and shellfish that may be used for purposes other than human consumption," and adopt "[o]ther rules necessary to carry out this title and the purposes and duties of the department." RCW 77.12.047(1)(h), (i), (o).

Fish life is defined by DFW in its rules as "*all* fish species, including food fish, shellfish, game fish, *unclassified* fish and *shellfish* species, and all stages of development of those species." WAC 220-660-030(56) (emphasis added). But, "shellfish" is defined by statute as "those species of marine and freshwater invertebrates *that have been classified* and that shall not be taken or possessed except as authorized by rule of the commission." RCW 77.08.010(60); WAC 220-660-030(136) (emphasis added). A list of invertebrates classified as shellfish by DFW and subject to regulation is found in WAC 220-320-010. WAC 220-660-030(56)'s definition of "fish life" aside, according to RCW 77.08.010(60), to be a shellfish, the organism must be classified; if it is not classified, it is not a shellfish. The definition for "unclassified shellfish" is *not* provided in either the hydraulic code or the rules.

Thurston agreed that unclassified shellfish fall within the definition of "fish life." WAC 220-660-030(56). Thurston stated, however, that in order to be considered a shellfish, a marine invertebrate must be classified. RCW 77.08.010(60). She explained that the definition of shellfish included only those fish that have been classified. If an invertebrate was not classified, Thurston explained that it was an "unclassified marine invertebrate," which is not defined in the hydraulic

25

code rules, because they are not subject to regulation under the rules. AR (RP (Nov. 19, 2020)) at 371. Thurston stated that these "unclassified marine invertebrates" would include "snails and nudibranchs and shore crabs, graceful grabs, sand dollars, sea stars, those are all unclassified marine invertebrates." AR (RP (Nov. 19, 2020)) at 371.

Siu's testimony supported that of Thurston. Siu testified that shellfish are a non-finfish species with a recreational or commercial interest including mollusks, cephalopods, and crustaceans. Siu testified that there are invertebrates that do not meet the definition of shellfish and "basically how we refer to them as an agency is everything else that does not have a commercial—well, I wouldn't say it doesn't have a commercial or recreational interest. But everything else that is not managed by us is an unmanaged invertebrate. We call those UMIs, U-M-I, unmanaged invertebrates." AR (RP (Nov. 20, 2020)) at 70.

Notwithstanding the above, Sound Action argues, that by DFW's own regulations, if shellfish include those marine invertebrates that have been classified, "unclassified shellfish" can be understood as those marine invertebrates that DFW has not classified for regulation. And since the definition of "fish life" includes "unclassified shellfish", then "fish life" necessarily includes these unclassified marine invertebrates (unmanaged invertebrates/UMIs). It further asserts that if DFW is required to protect all fish life then the invertebrates, too, should be protected from the direct impacts of hydraulic projects via no net loss mitigation and compensation provisions.

DFW responds that unclassified marine invertebrates are not shellfish. DFW argues that unclassified marine invertebrate should be treated as part of the habitat; a food source on which fish and shellfish rely. DFW also argues that requiring mitigation for unclassified marine invertebrates "would mean requiring project proponents to take measures to avoid and minimize

risk to animals as small as zooplankton, which would be impractical, if not impossible." Br. of Resp'ts at 54.

Here, the hydraulic code provides the definition of "shellfish" as those invertebrates that DFW *has classified*. RCW 77.08.010(60). The legislature granted DFW the authority to classify shellfish. RCW 77.12.047(1)(h), (i). DFW has not classified "unclassified marine invertebrates" as shellfish. Further, DFW has interpreted the hydraulic code and rules not to consider these unclassified marine invertebrates when assessing direct impacts to fish and shellfish. We grant DFW deference in the interpretation of the law it administers, and affirm the Board's determination that unclassified marine invertebrate are neither fish nor shellfish.

B.      "No Net Loss" In This Context Regards The Reproductive Capacity of a Fish
         Species.

Sound Action argues that achieving "no net loss" as required through mitigation actions requires that there be no net impacts to individual fish below population-level effects as opposed to reproductive level effects, as the Board concluded. Sound Action argues that "[t]he statutory and regulatory scheme for hydraulic projects demonstrates that the Board erred" in concluding that impact levels to fish life refer to reproductive levels. Br. of Appellant at 51. Because testimony supported that the no net loss standard for impact to fish life refers to the reproductive capacity of a fish species, we uphold the Board's conclusion.

DFW protects fish life by applying a "no net loss" standard that is achieved "through a sequence of mitigation actions" as outlined in the "mitigation sequence." WAC 220-660-080(3)(c), (d). DFW defines "no net loss" as sequentially avoiding impacts, minimizing

27

unavoidable impacts, and compensating for remaining adverse impacts to fish life, net loss of habitat functions necessary to sustain fish life, and loss of area by habitat type. WAC 220-660-030(110). "Compensatory mitigation is not required for hydraulic projects if other actions in the mitigation sequence are taken that avoid or offset impacts to fish life." WAC 220-660-080(3)(e).

At the hearing, Thurston explained the "no net loss" standard for impact to fish life and what it applied to. Thurston stated:

> It really applies to the—*the reproductive capacity* or productive capacity of the stock. So, you know, I think we recognize that any time somebody does something in the water, there's a risk to fish life. Because fish—fish are present unless it's—the work is being done in headwater stream above fish presence.
> So what we're looking at is, you know, is the project—would the project be significant enough to cause a loss of productive capacity for the stock or the population, and that's reflected in our mitigation policy.

AR (RP (Nov. 19, 2020)) at 336 (emphasis added).

Carey acknowledged that "compensatory mitigation for direct impact to fish *is not fish by fish*. There's *never a project* that you could quantify specifically how many shellfish or fish were killed or harmed." AR (RP (Nov. 19, 2020)) at 272-73 (emphasis added). Carey stated that "[w]hat you look at under the hydraulic code and that net loss is you're recognizing that there is impact. You avoid, you minimize, and then you compensate. But, again, it's not fish by fish. . . . I've never seen a situation where that was dependent on somebody counting fish or shellfish that were harmed or killed." AR (RP (Nov. 19, 2020)) at 273.

Here, the Board concluded that, provided "[DFW] follows the mitigation sequence and determines there will be no net loss to the reproductive capacity of a fish species population, [DFW] complies with the law." AR at 1420. In doing so, the Board relied on Thurston's

testimony, outlined above. Nothing within the regulatory scheme compels us to reach a different conclusion as argued by Sound Action.[13]

Sound Action also argues that a policy referenced by Thurston refers to a net gain in productive capacity rather than reproductive capacity. It further argues that the policy is not considering direct impacts from hydraulic project impacts but rather impacts "from oil or other toxic spills." Br. of Appellant at 57.

Sound Action's argument is unavailing. Sound Action provides no definition for "productive capacity" to support that the term does not encompass "reproductive capacity." In her testimony, Thurston uses the phrase "'reproductive capacity' or 'productive capacity.'" AR (RP (Nov. 19, 2020)) at 336. Thurston's testimony was in response to the meaning of "no net loss" as DFW uses that standard. The Board could properly rely on her testimony when determining DFW's interpretation of the term. DFW did not erroneously interpret or apply the law.

C. DFW Complied With The Law When It Follows the Mitigation Sequence and Determines There Is No Net Loss to Reproductive Capacity of a Fish Species.

Sound Action challenges the Board's conclusions of law 16-24 in which the Board determined that DFW complied with the mitigation sequence and determined that provisions in the HPA adequately provided for the protection of fish life. Sound Action argues that the Board erred when it determined that the impacts caused by the proposed dredging resulted in no net loss, even without compensatory mitigation. Sound Action also argues that the HPA authorizes harm to fish life, pointing to potential impacts and the potential presence of fish life at the site.

---

[13] Sound Action argues that the hydraulic code rules support that impacts below that of a reproductive population level impact must be considered when considering whether a no net loss has been achieved. Contrary to Sound Action's argument, the regulatory scheme provides no indication of whether DFW is required to measure "no net loss" by individual fish counts or reproductive capacity.

The Board concluded that DFW complied with the mitigation sequence for fish life that it regulated, and Sound Action failed to provide evidence to the contrary. As outlined above, the mitigation sequences includes avoidance, minimization and compensation. WAC 220-660-030(104). The Board found that Sound Action bore the burden of showing that DFW failed to comply with this sequence.

Here, Sound Action argues that HPA permits potential impacts to fish life caused by dredging including entrainment, turbidity, and changing predator-prey interaction. Examples given by Sound Action include the potential that turbidity forces fish, including juvenile salmon, to swim away from the project site decreasing their feeding opportunities and pushing them to danger from predators. Sound Action also points to the potential for the removal of burrowed sand lance. During her testimony, Carey stated that "if you have sand lance that are burrowed at a site, they are certainly a species that will have entrainment impact." AR (RP (Nov. 18, 2020)) at 142-43.

Here, the HPA contains provisions that are in place to minimize potential impacts. For example, with regard to turbidity, Thurston stated "certainly the provision on how to operate a clamshell dredge . . . is there because of that, as the reason for that is to eliminate or minimize sediment [suspension] to the extent possible." AR (RP (Nov. 19, 2020)) at 343. Sound Action shows possible impacts, however, fails to provide argument to support that DFW failed to consider these impacts or follow the required mitigation sequence. Sound Action also fails to provide evidence that the reproductive capacity of a species will be impacted such that compensatory mitigation is required. Because Sound Action fails to show that DFW failed to comply with mitigation requirements, we affirm.

V.    BOARD'S DECISION DENYING CAREY AS EXPERT

Sound Action argues that the Board's decision not to qualify Carey as an expert in biology was arbitrary and capricious, because Sound Action never requested to qualify Carey in the field of biology, but rather the narrower field of nearshore ecology. Sound Action argues that the Board determined not to qualify Carey on the basis that she lacked a formal education.

An arbitrary or capricious action is one which is "'willful and unreasoning and taken without regard to the attending facts or circumstances.'" *Port of Seattle*, 151 Wn.2d at 589 (quoting *Wash. Indep. Tel. Ass'n*, 149 Wn.2d at 26). When "there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997).

The presiding officer may admit evidence "if in the judgment of the presiding officer it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." WAC 371-08-500(1). The presiding officer "shall give consideration to, but shall not be bound to follow, the rules of evidence governing civil proceedings in matters not involving trial by jury in the superior courts of the state of Washington." WAC 371-08-500(1).

"Generally, expert testimony is admissible if (1) the expert is qualified, (2) the expert relies on generally accepted theories in the scientific community, and (3) the testimony would be helpful to the trier of fact." *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 352, 333 P.3d 388 (2014). "In applying this test, trial courts are afforded wide discretion and trial court expert opinion decisions will not be disturbed on appeal absent an abuse of such discretion." *Id*. ER 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." An erroneous evidentiary decision requires reversal only if the error was prejudicial. *Saldivar v. Momah*, 145 Wn. App. 365, 401, 186 P.3d 1117 (2008). An error is prejudicial if "within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." *Id.*

Here, Sound Action moved to qualify Carey "as an expert witness on nearshore ecology and development impacts." AR (RP (Nov. 18, 2020)) at 32. The record before the Board contained, aside from Carey's testimony, her declaration and resume detailing her experience. In her declaration, Carey stated that for over a decade, she worked in habitat protection and regulatory oversight. She declared that she regularly gives presentations to community and marine focused entities and is an avid researcher.

Carey's main body of work focuses on the hydraulic code. She stated that the organization reviews "every HPA permit that's in those marine nearshore waters in the inner portion of the Washington State Salish Sea." AR (RP (Nov. 18, 2020)) at 18. Personally, she has reviewed more than 3,000 HPAs. During the hearing, Sound Action's counsel asked Carey how she prepares herself "to understand the science that is occurring in those nearshore ecosystems?" AR (RP (Nov. 18, 2020)) at 23. Carey explained that Sound Action has "decades of sort of working in the field and sort of having that constant commitment to staying up to date on research and the science and the species and continuing education on that." AR (RP (Nov. 18, 2020)) at 23. Carey testified that she did not have a college degree and that she had not visited Dyes Inlet specific to the proposed dredge.

At the hearing, the presiding officer stated that "[b]ased on Ms. Carey's experience reviewing HPAs and as an advocate for the nonprofits, and considering her lack of formal education[,] . . . I'm going to rule that Ms. Carey is not an expert in biology, but she does have expertise in the hydraulic code and her experience, her practical experience and personal experience in reviewing relevant documents." AR (RP (Nov. 18, 2020)) at 33-34. The Board determined that Carey was "limited in her expertise with regard to biology and the biological functions of fish and fish life and nearshore habitats." AR (RP (Nov. 18, 2020)) at 33.

The evidence supports that Carey's expertise and experience stemmed from working primarily in regulatory oversight and with the hydraulic code. Carey had extensive experience reviewing HPAs, providing oversight to the regulatory process, and reviewing scientific research relevant to this oversight. The Board's decision shows that it considered Carey's relevant work experience as well as her lack of formal education when it determined that she was not an expert in biology. Notwithstanding the Board's ruling, Carey was permitted to opine on salmon behavior, nearshore environments, the presence of certain fish species at the project site, vegetation including the presence of macroalgae, dredging impacts, and mitigation efforts by DFW.

We conclude that the Board's determination that Carey was not an expert in nearshore ecology and development impacts was not arbitrary and capricious. Carey's expertise stemmed from her oversight of regulatory processes. Although Carey conducted extensive review of HPAs, including reviewing scientific articles and conducting presentations, Carey lacked formal education specifically in biology or ecology. The Board could properly determine not to qualify her as an expert specifically in nearshore ecology and development impacts.

Even if the Board had erred by ruling that Carey did not qualify as an expert, any error was harmless. Contrary to Sound Action's argument that the Board's decision prevented meaningful testimony regarding project impacts, the Board provided latitude in Carey's testimony provided a foundation was laid for her testimony. Further, the Board considered Carey's testimony as well as her experience when entering its findings of fact and conclusions of law and determined the weight to give her testimony.

VI.    CHALLENGED FINDINGS OF FACT

As stated above, substantial evidence is that "'quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" *Port of Seattle*, 151 Wn.2d at 588 (quoting *King County*, 142 Wn.2d at 543). We will overturn an agency's factual findings only if clearly erroneous. *Id*. We do not reweigh the evidence or substitute its judgment for that of the Board. *Id*.

A.    Finding of Fact 1—Maintenance Dredging in the Amount of 17,165 Cubic Yards Would Occur at the Project Site.

Sound Action argues that there is a lack of evidence showing that 17,165 cubic yards of material has been dredged from the marina in the past and also a lack of evidence showing a past footprint dredge. This argument is addressed above. Because substantial evidence supports the Board's decision, and we do not reweigh evidence, we affirm.

B.    Finding of Fact 7—Carey "relied on high level general maps and research articles from other sites to make her conclusions on the presence of fish and shellfish species and potential dredge impacts." AR at 1408.

Sound Action argues no evidence supports the above finding. Sound Action argues that Carey relied on the Port's application materials, including site-specific information, such as the biological evaluation, as well as maps and habitat reporting from state and federal agencies and

scientific literature relating to fish species and habitats. We hold that substantial evidence supports the Board's finding.

Carey stated that she reviewed everything filed by the Port in support of its application and available to the public. This included the biological evaluation. She relied on "publicly available GIS mapping sets, historic aerial photos, various habitat inventories and [her] personal knowledge of the Dyes inlet area to assess ecosystem impacts from the proposed impacts." AR at 349. She also relied on maps and studies that explained impacts to fish and shellfish from dredging. Carey did not visit Dyes Inlet as part of her review of the dredging project. The Board's finding of fact is supported by substantial evidence.

C.      Finding of Fact 9—"Carey's opinions outside her expertise were not persuasive." AR at 1408.

Sound Action characterizes the above finding as the Board determining that "Carey's opinions about nearshore impacts lie outside of her expertise." Br. of Appellant at 25. Sound Action's contention specific to the Board's determination that Carey did not qualify as an expert with regard to nearshore ecology is addressed above. We affirm.

D.      Finding of Fact 14—Entrainment mortality risk from dredging is temporary.

Sound Action argues that "entrainment mortality, or fish deaths caused by their removal as part of the dredge project, is a permanent impact." Br. of Appellant at 26. As phrased, the challenged finding of fact provides no indication that the Board disagreed, though Sound Action is arguing about an impact being permanent, not a risk, which the Board's finding speaks to. The error assigned is immaterial. Moreover, that entrainment mortality *risk* is temporary is supported by substantial evidence in the record.

E.      Findings of Fact 17, 19 and 21—"Mechanical dredging has less detrimental effects on marine life than hydraulic dredging," "Finfish will swim away from the dredging activities," and "Mechanical clamshell dredging creates less turbidity than hydraulic dredging" or other types of dredging. AR at 1411.

Sound Action argues that there is no evidence that mechanical dredging creates less turbidity than hydraulic dredging. Sound Action also argues that the HPA requires the dredging of the boat ramp to occur when in the dry and this would "prevent burrowed sand lance or any other fish or shellfish from being able to escape entrainment by swimming away." Br. of Appellant at 27.

Siu stated that mechanical dredging was much less impactful than hydraulic dredging because it lacked a vacuum effect and occurred at a slower rate. Siu explained that hydraulic dredging can cause a fish to be sucked in whereas a fish has time to get away from a slow-moving clamshell dredge. Siu also stated that when the tide goes out, fish are taken out with the tide. Thurston's and Leitman's testimony also supported that the impact from clamshell dredging is less impactful than hydraulic dredging. Leitman opined that the only impacts from a clamshell dredge would be "very temporary [and] localized," including any plume that resulted. AR (RP (Nov. 19, 2020)) at 419. Leitman distinguished "an inordinate amount of plume" in the context of hydraulic dredging where the marina bottom is stirred up and then vacuumed from mechanical dredging where material is scooped and removed. AR (RP (Nov. 19, 2020)) at 19.

The expert testimony supports that a mechanical dredge moves slower and is less impactful than hydraulic dredging, including in the amount of turbidity created. Therefore, substantial evidence supports the Board's finding that mechanical dredging has less detrimental impacts than hydraulic dredging. Siu also stated that fish have time to swim away from a clamshell dredge.

36

F.      Finding of Fact 25—"Siu described the Project site as muddy and devoid of submerged aquatic vegetation, with primarily fine sediment." AR at 1413.

Sound Action argues that Siu never claimed that the boat ramp area was "muddy and devoid of any submerged aquatic vegetation." Br. of Appellant at 28. In its reply brief, Sound Action also argues that the evidence does not support that the area under the pier and recreational floats was devoid of submerged aquatic vegetation.

Siu described the sediment at the boat ramp area as "sand with pea gravel." AR at 1467. He also later testified that the sediment at the boat ramp was tested and "it turned out that the sediment was too fine, too silty or muddy to be beneficial." AR (RP (Nov. 20, 2020)) at 31. Siu described the dock area as a "silty, muddy mess." AR (RP (Nov. 20, 2020)) at 28.

Specific to vegetation, Siu stated that the area under the marina was "devoid of any submerged aquatic vegetation." AR at 1467. He later acknowledged that some low and high density Gracilaria was mapped within the dredge footprint. Siu testified, however, that the amounts found were characterized as "trace" amounts by the MSA survey conducted at the site. AR (RP (Nov. 20, 2020)) at 125. Leitman, who conducted the survey of the dredge site, described the dredge site as "generally . . . barren." AR (RP (Nov. 19, 2020)) at 444.

Here, substantial evidence supports the Board's finding. Looking to the project site as a whole, the site was muddy and devoid of submerged aquatic vegetation. Siu's and Leitman's descriptions support this finding.[14]

---

[14] Sound Action argues that "[i]f the *Gracilaria* were confirmed for use for spawning, it would qualify as a saltwater habitat of special concern according to [DFW]." Br. of Appellant at 29. Sound Action also points to testimony that DFW failed to survey the entire dredge site as required by DFW survey protocols. These additional arguments do not compel a different conclusion. Evidence within the record supports the Board's finding.

G.     Finding of Fact 29—"[S]and lance are less likely to be found in the dredging area around the boat ramp, where the sediment is predominantly fine-grained."  AR at 1414.

Sound Action argues that the sediment at the boat ramp was suitable for sand lance burrowing.

Siu described the boat ramp area habitat as "sand with pea gravel" in which "sand lance and surf smelt have been documented to spawn."  AR at 1467.  Carey stated that sand lance have a preference for coarse over medium sand.  Leitman stated that she did not see any sand lance at the project site.  She acknowledged, however, that the boat ramp would provide a more suitable location for sand lance spawning rather than the dock, because it's not as fine of material.  Siu testified that he sought to have the dredging material from the boat ramp inspected for possible "beneficial reuse," because reusing sediment "potentially can provide habitat if it's the right size of sediment."  AR (RP (Nov. 20, 2020)) 30-31.  A geologist for the Port determined that the material was "too fine" in sediment size.  AR (RP (Nov. 20, 2020)) at 31.  Therefore, the sediment could not be reused on the beach for example, because it could have an adverse effect on the habitat there.  Siu stated, "Typically what has been—what is used beneficially are sediment of the grain size of sand to—between sand and pea gravel.  You know, that's the type of sediment that is preferred by forage fish."  AR (RP (Nov. 20, 2020)) at 31.

Here, the Board found that sand lance were not likely to be found at the boat ramp due to their preference for well-drained coarse sand to finer sediments.  This finding was supported by testimony that the soil was too fine for beneficial reuse and testimony that forage fish prefer sediment that is between the grain size of sand and pea gravel.  Because substantial evidence supports this finding, we uphold it.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Maxa, P.J.

Price, J.